788 S.E.2d 295

**Jennifer N. TAYLOR and Susan S. Perry, Petitioners/Plaintiffs Below**

v.

**The WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Rocco Fucillo, and Warren Keefer, Respondents/Defendants Below.**

No. 14–0679.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 20, 2016.

Decided April 14, 2016.

---

**6.** Insofar as resolution of notice is dispositive, we need not address the remaining assignments of error.

Barbara H. Allen, Esq., Pittsburgh, PA, Michele Rusen, Esq., Walt Auvil, Esq., Rusen and Auvil, PLLC, Parkersburg, WV, Attorneys for Petitioners.

Charles R. Bailey, Esq., Betsy L. Stewart, Esq., Bailey & Wyant, PLLC, Charleston, WV, Attorneys for Respondents.

WORKMAN, Justice:

This is an appeal from the Circuit Court of Kanawha County's May 16, 2014, and June 13, 2014, orders granting summary judgment in favor of respondents West Virginia Department of Health and Human Resources (hereinafter "DHHR"), Rocco Fucillo, and Warren Keefer (hereinafter collectively "respondents") on each of petitioners Jennifer N. Taylor and Susan S. Perry's claims surrounding their discharge from employment with DHHR. The circuit court ostensibly found, in sum, that petitioners failed to create a genuine issue of material fact surrounding their claims and respondents were likewise entitled to qualified immunity on all such claims.[1]

Based upon our review of the briefs, legal authorities, appendix record, and upon consideration of arguments of counsel, we affirm the circuit court's grant of summary judgment as to petitioners' retaliatory discharge,

gender discrimination claims pursuant to the Human Rights Act, and false light invasion of privacy claims. However, the Court finds that the circuit court erred in granting summary judgment on petitioners' whistle-blower claims and we therefore reverse and remand to the circuit court for further proceedings as to those claims.

## I. FACTS AND PROCEDURAL HISTORY

### A. Factual Background

Petitioners Susan S. Perry and Jennifer N. Taylor are the former Deputy Secretary for Legal Services and General Counsel of DHHR, respectively. This case centers around their involvement, in the course of their employment, with a Request for Proposal (hereinafter "RFP") soliciting bids for a contract to provide advertising services to DHHR. Petitioners allege, in addition to claims of gender discrimination and invasion of privacy, that they were discharged from their employment for discovering and alerting others to what they purportedly believed to be errors or irregularities with the procurement process.

In 2011, the subject RFP was issued by the Purchasing Division of the West Virginia Department of Administration (hereinafter "Purchasing"). The statutory RFP process for State contracts provides for a system of competitive bidding whereby bidders submit both a "technical" and "cost" proposal: the technical proposal describes the services proposed and the cost proposal contains the cost of the services proposed.[2] The technical proposals are first evaluated by a scoring committee, which provides scores for each submission to the Purchasing Division; upon approval by Purchasing, the cost proposals are then opened and scored by the committee, yielding a total score upon which the recommendation for award of the contract is based. Once technical scores are approved by Purchasing and cost bids are opened, the technical scores cannot be changed. Critically, West Virginia Code § 5A–3–28 through –

---

1. The multiple and varying bases of the circuit court's grant of summary judgment, as contained in its order, are addressed more fully *infra*.

2. *See generally* West Virginia Code § 5A–3–1 *et seq.*

31 criminalizes certain conduct with respect to purchasing or supplying of services pursuant to the procurement statutes.

On or about May 1, 2012, John Law, Assistant Secretary, Office of Communications and Legislative Affairs for DHHR, advised petitioner Perry that he had concerns about the technical scoring of the RFP.[3] Petitioner Perry then requested petitioner Taylor to perform a "legal review" of the technical scoring.[4] Petitioner Taylor reported to petitioner Perry that her review revealed that the scoring was "the very definition of arbitrary and capricious."[5] However, at the time petitioner Taylor's undertook her review, the technical scores had been approved by Purchasing and the cost bids opened. Neither petitioner inquired as to the status of the RFP bid openings before undertaking the review and there appears to be considerable debate about whether and when petitioners knew or should have known that the cost bids had been opened, precluding revision of the technical scores.

Upon learning of the legal review, respondent Warren Keefer, Deputy Secretary for Administration of DHHR, took the position and advised petitioner Perry that the legal review was inappropriate and "could readily be perceived as bid fixing or some other attempt to alter [the] outcome" of the RFP. Bryan Rosen, Director of Purchasing of DHHR, agreed, stating that he was "concerned about the implication of having people outside the committee potentially swaying the procurement process." The parties appear to agree that on May 16, 2012, after a "contentious" meeting among petitioners, respondent Keefer, and Mr. Rosen, petitioners ostensibly agreed to "stand down" on their concerns. However, on or about June 1, 2012, upon request by the Governor's office for an audit of all outstanding legal issues for purposes of the transition from retiring DHHR Secretary Dr. Michael Lewis to incoming Acting DHHR Secretary respondent Rocco Fucillo, petitioner Perry identified a potential legal challenge to the RFP as an outstanding issue. Respondent Keefer had likewise contemporaneously advised respondent Fucillo of petitioners' activities relative to the RFP. After advising petitioner Perry that, the legal review notwithstanding, the contract would be awarded to the successful bidder,[6] respondent Fucillo sought legal advice regarding petitioners' activities from DHHR Inspector General David Bishop. Upon being alerted to these issues, Inspector Bishop launched an investigation into the RFP and the activities of petitioners and Mr. Law on or about July 15, 2012, based upon his concern that criminal activity may have occurred.

Upon commencement of the investigation, on July 16, 2012, petitioners were placed on administrative leave. Thereafter, they were placed on administrative reassignment and relocated to different offices performing what they have characterized as menial tasks not

**3.** The record suggests that Mr. Law, who was likewise terminated from his position as a result of his involvement in the RFP, made multiple inquiries about the status of the RFP and successful bidder throughout the process and took it upon himself to advise the Governor's office about "problems" with the RFP. The record further indicates that the DHHR investigation into this matter determined Mr. Law to have a personal interest in the outcome of the RFP, given his close working relationship with the prior contract-holder, The Arnold Agency. Based on the investigation, DHHR concluded that Mr. Law's actions were an effort to ensure The Arnold Agency received the contract award; Mr. Law testified that he "would like to have seen" The Arnold Agency awarded the contract. Petitioners maintain that they were unaware of any potentially improper motivations on the part of Mr. Law. Further, nothing in this opinion should be construed as casting aspersions on Mr. Law's activities or motivations inasmuch as such issues

are neither before this Court nor pertinent to the legal issues resolved herein.

**4.** Petitioner Perry asserts that her concerns and actions relative to the RFP were borne out of fear that the RFP would follow a similar path as a Medicaid MMIS contract issued in the previous year which had been "mishandled" and caused her to be subject to "scathing publicity and concomitant anger from the Governor's Office."

**5.** The DHHR investigation, however, concludes that petitioner Taylor's criticisms of the scoring were entirely subjective and revealed an intent to favor The Arnold Agency.

**6.** Fahlgren Mortine was the successful bidder. Although The Arnold Agency had the lowest cost bid, Fahlgren Mortine had a higher "technical" score, resulting in Fahlgren Mortine having the successful "best value procurement score."

befitting their status and experience. At the close of Inspector Bishop's investigation on October 12, 2012, he recommended the matter be turned over to the Kanawha County Prosecuting Attorney's Office, which ultimately declined to prosecute. However, before the Prosecutor declined prosecution, a search warrant was executed by the West Virginia State Police seeking documents and communications of Mr. Law and petitioners regarding the RFP, which search warrant was subsequently released to and publicized in the media. The search warrant was drafted by Inspector Bishop and appears to be largely comprised of excerpts from and summaries of the content of the DHHR investigative report. The search warrant stated that it was being sought on the basis that Mr. Law and petitioners had violated West Virginia Code § 5A–3–31 (1990), which made it a felony to "combine, collude or conspire . . . with respect to the purchasing or supplying of commodities or printing to the state" for the purpose of "caus[ing] one prospective vendor or vendors to be preferred over one or more other prospective vendor or vendors." [7]

During the course of the DHHR investigation it was discovered that petitioner Taylor had e-mailed confidential attorney-client information to her husband, Steve Haid.[8] Although not made a part of the investigative report, the report's author advised Inspector Bishop of this discovery. In her deposition, petitioner Taylor admitted sending the email and that doing so was a breach of attorney-client privilege.

Shortly after the investigation and declination of prosecution, on February 20, 2013, petitioner Taylor was terminated. On June 26, 2013, petitioner Perry was thereafter offered another position, which she declined.[9] On June 28, 2013, she was sent a letter on DHHR letterhead executed by Harold Clifton, Human Resources Director for DHHR, advising that her employment was being terminated. Governor Tomblin's Chief of Staff, Charles Lorensen, testified that petitioner Perry's "termination" was his decision; however, he disagreed with the characterization that petitioner Perry was "fired," rather, indicating that the incoming Secretary of DHHR, Karen Bowling, should be permitted to set up her own leadership team.

### B. Procedural History

During the pendency of their administrative reassignment, but before they were terminated, petitioners filed the instant action against respondents, subsequently amending their complaints upon termination. Petitioners' amended complaints allege the following causes of action: violation of the Whistleblower Law, retaliatory discharge in contravention of the Ethics Act and their obligation to provide "honest legal advice,"[10] gender discrimination, and false light invasion of privacy.

After extensive discovery, respondents filed various dispositive motions. On April 15, 2014, the circuit court entered an order granting summary judgment as to petitioner Taylor's "discharge" claims against Mr. Keefer, finding that Mr. Keefer did not discharge her, nor participate in her discharge.[11] On

---

**7.** The current version of West Virginia Code § 5A–3–31 (2014) now also makes it unlawful for any singular person to "corruptly act alone" in this regard and expressly includes "services" in addition to commodities and printing.

**8.** The email contained a chain of correspondence regarding a House bill affecting the Bureau for Children and Families Division of Early Care and Education and an exchange with an Assistant Attorney General. Mr. Haid was a registered lobbyist for K12, Inc. and West Virginia Kids Count Fund. The DHHR investigator opined that the information may have provided an advantage to anyone with whom it was shared.

**9.** Petitioner Perry was offered the position of Deputy Commissioner—General Counsel of the

West Virginia Bureau of Senior Services at an equivalent salary.

**10.** The retaliatory discharge claims are brought pursuant to Syllabus, *Harless v. First Nat'l Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978) and are hereinafter occasionally referred to as *"Harless"* claims.

**11.** The final paragraph of this order also purports to dismiss with prejudice "any other claim pled in Plaintiff Taylor's Complaint that is based on allegations of wrongful, retaliatory or illegal discharge claims by *these Defendants[.]*" (emphasis added). None of the parties have addressed before this Court the apparent overbreadth of the circuit court's order in this regard.

May 16, 2014, the circuit court entered an order granting summary judgment as to petitioner Perry's "discharge" claims against *all* defendants, finding that petitioner Perry was not discharged by DHHR, but rather was discharged by the Governor's Office. Despite having awarded summary judgment to respondents on ostensibly the entirety of *both* petitioners' discharge claims, *see* n.11, *supra*, leaving only the gender discrimination and invasion of privacy claims, the circuit court entertained a "combined" motion for summary judgment on all claims pled by both petitioners and awarded summary judgment to respondents as reflected in its June 13, 2014, omnibus order dismissing the entirety of petitioners' claims against respondents. Petitioners filed a Notice of Appeal of only the May 16, 2014, and June 13, 2014, orders.[12]

## II. STANDARD OF REVIEW

■ It is well-established that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). In regard to our *de novo* review of the circuit court's grant of summary judgment, this Court has repeatedly made clear that, "[t]he question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." Syl. Pt. 5, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). It is critical that "[i]n determining whether a genuine issue of material fact exists, this Court construe[ ] the facts in the light most favorable to the party against whom summary judgment was granted." *Belcher v. Wal–Mart Stores, Inc.*, 211 W.Va. 712, 718, 568 S.E.2d 19, 25 (2002).

Moreover, this Court has explained that "[t]he essence of the inquiry the court must make is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 61, 459 S.E.2d 329, 338 (1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court has noted that "[p]articularly in 'complex cases ... where issues involving motive and intent are present,' summary judgment should not be utilized as a method of resolution." *Kelley v. City of Williamson, W. Va.*, 221 W.Va. 506, 510, 655 S.E.2d 528, 532 (2007) (citation omitted). With these standards in mind, we turn to the claims presented herein, each of which the circuit court found to be susceptible to summary judgment.

## III. DISCUSSION

Petitioners make eight[13] separate assignments of error; in short, with respect to all of their claims, petitioners argue that the circuit court erred in both the making of specific factual and legal findings and in the manner in which it construed the facts as a whole. Petitioners further assert that the circuit court erred in finding respondents entitled to qualified immunity on all of their claims.

■ We pause before we begin our analysis of the foregoing to address the circuit court's June 13, 2014, omnibus order, which primarily forms the basis of this appeal and the difficulties which the order presents. Recognizing of course that this order was prepared by respondents' counsel and merely

---

**12.** Petitioners acknowledge their failure to include the April 15, 2014, order in their notice of appeal, but urge that consideration of this order and its findings is permitted by West Virginia Rule of Appellate Procedure 10(c)(3), which provides that "assignments of error need not be identical to those contained in the notice of appeal." While certainly this Rule permits some variation from the assignments of error denoted in a notice of appeal and those presented in brief, in no way does this Rule effectively permit review of findings and legal rulings not contained within the order(s) presented for appeal. We note that the June 13, 2014, omnibus order does

not incorporate or address the specific findings as against Mr. Keefer contained in the April 15, 2014 order. Accordingly, we find the April 15, 2014, order and its findings not properly before the Court and therefore decline to address petitioners' assignment of error eight seeking reversal of the circuit court's grant of summary judgment as to petitioner Taylor's discharge claims against respondent Keefer.

**13.** *See* n.12, *supra* regarding assignment of error eight.

executed and entered by the circuit court, we would be remiss if we failed to caution the lower courts regarding the risks attendant to adopting and entering—wholesale—orders prepared by counsel. We recognize the common practice of requesting attorneys to prepare proposed orders for consideration by the court while a matter is under advisement and, in general, find nothing untoward about this process.[14] We caution circuit courts, however, that the burden of issuing an order which meets this Court's requirements, which requirements are designed to permit meaningful appellate review, ultimately remains on the circuit court. It is incumbent on the trial court to determine if the submitted order accurately reflects the court ruling given that it is well-established that "[a] court of record speaks only through its orders[.]" *State ex rel. Erlewine v. Thompson,* 156 W.Va. 714, 718, 207 S.E.2d 105, 107 (1973). With respect to summary judgment, this Court has stated that "the circuit court's order must provide clear notice to all parties and the reviewing court as to the rationale applied in granting or denying summary judgment." *Fayette Cty. Nat'l Bank v. Lilly,* 199 W.Va. 349, 354, 484 S.E.2d 232, 237 (1997), *overruled on other grounds by Sostaric v. Marshall,* 234 W.Va. 449, 766 S.E.2d 396 (2014).

Having reminded our lower courts of their obligations relative to entry of an order granting or denying summary judgment, we find it necessary to admonish counsel regarding preparing and tendering over-reaching orders which fail to succinctly identify and address the critical factual and legal issues. The order prepared by respondents contains seventy pages and 105 separately delineated paragraphs which contain, in large part, nothing more than a thicket of argumentative rhetoric. Respondents' tendered order consists entirely of their version of the disputed facts and advocated inferences, upon which what little legal analysis it contains teeters precariously. Sections entitled "conclusions of law" are little more than one-sided rhetorical diatribes.

The order is similarly scattershot on the legal issues presented and concomitant legal analysis. Imbedded throughout the order are multiple legal determinations, any one of which may dispositive of a particular claim, notwithstanding the fact that the order summarily concludes that summary judgment was granted simply due to the absence of a genuine issue of material fact and the presence of qualified immunity. Parties do themselves little favor by tendering such heavily partisan orders to the circuit court which fail so demonstrably to articulate a cogent outline of the claims subject to disposition, the undisputed facts pertinent to the analysis, and the legal basis therefor. This Court strongly disfavors such "kitchen sink" orders inasmuch as they present a substantial impediment to comprehensive appellate review.

The order tendered by respondents is so confounding that the effect is to leave this Court struggling to comprehensively discern upon which specific bases the summary disposition was awarded such as to guide our discussion. Accordingly, in addressing petitioners' assignments of error, we find it expedient to approach each cause of action separately and place the myriad issues before the Court into their proper context relative to the causes of action asserted.

### A. Qualified Immunity

Before addressing each individual cause of action, however, we begin with the circuit court's ostensible conclusion that petitioners' claims are entirely barred by the doctrine of qualified immunity. Petitioners' causes of action plainly center around their respective discharges from employment and the actions of respondents surrounding their discharge. For purposes of qualified immunity, this Court has noted that "the broad categories of training, supervision, and employee retention ... easily fall within the category of 'discretionary' governmental functions." *W. Va. Reg'l Jail & Corr. Facili-*

---

**14.** West Virginia Trial Court Rule 24.01, in fact, governs the preparation and submission of orders by counsel. However, the Rule appears to contemplate preparation of orders subsequent to the court's ruling on a matter, thereby allowing the parties to utilize the court's ruling to direct the specific content and particular findings.

*ty Auth. v. A.B.*, 234 W.Va. 492, 514, 766 S.E.2d 751, 773 (2014). Given that respondents' employment actions involving petitioners constituted a discretionary governmental function, the qualified immunity analysis is governed by our holding enunciated in *A.B.*, as follows:

> To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

Syl. Pt. 11, *A.B.*, 234 W.Va. 492, 766 S.E.2d 751. Therefore, to the extent that petitioners have established sufficient evidence that the challenged employment actions were a violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise "fraudulent, malicious, or oppressive," respondents' actions are not susceptible to qualified immunity.

Despite the order's blasé references to qualified immunity and the "discretionary" nature of employment decisions peppered erratically throughout, it is clear that even a cursory analysis of the issue reveals that petitioners' claims are not barred by qualified immunity. Petitioners allege that respondents' actions in regard to their employment violated the Whistle Blower Law, the Human Rights Act, and our long-standing common law prohibition on retaliatory discharge as set forth in *Harless*—all well-established statutory rights and laws. Moreover, petitioners' false light invasion of privacy claims are based upon their contention that respondents' investigation and the ensuing search warrant were unsubstantiated accusations of criminal activity borne out of reprisal—plainly satisfying the requirement of "fraudulent, malicious, or oppressive" activity.

As perhaps best demonstrated by the respondents' dizzying attempt to corral the facts and dispense with contrary inferences, this case contains a pervasive factual dispute about each of the parties' motivations, precluding entry of summary judgment on qualified immunity grounds. As this Court has stated, summary judgment on immunity issues belong to the Court, "*unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination.*" Syl. Pt. 1, in part, *Hutchison v. City of Huntington*, 198 W.Va. 139, 479 S.E.2d 649 (1996) (emphasis added). Accordingly, we find little difficulty in concluding that the circuit court erred in finding that petitioners' claims are barred by qualified immunity.

## B. Petitioners' Employment Claims

Petitioners set forth three separate causes of action arising out of their employment: 1) discharge in violation of the West Virginia Whistle–Blower Law; 2) common law "*Harless*"-based retaliatory discharge; and 3) gender-based discrimination in violation of the West Virginia Human Rights Act. Certain of the circuit courts' conclusions affect the viability of petitioners' employment claims equally and will therefore be addressed collectively at the outset. Rulings limited to a particular cause of action are discussed more fully *infra*.

We begin with the circuit court's apparent legal conclusion, with respect to petitioner Perry, that she was not actually discharged by respondents; therefore, no liability for her discharge may be affixed to them. The circuit court concluded that the evidence revealed that the decision to discharge petitioner Perry was made by the Governor's Office, as admitted by Chief of Staff Charles Lorensen, and that her actual employer—DHHR—was merely the "messenger," delivering news of her termination on its own letterhead as executed by its

**560**

Human Resources Director, Harold Clifton.[15] Accordingly, the circuit court, in its May 16, 2014, order concluded that petitioner Perry could not establish the requisite element of "discharge" as against respondents and granted summary judgment on petitioner Perry's whistle-blower and Human Rights Act claims as well as "any other claim pled in Plaintiff Perry's Complaint that is based on allegations of wrongful, retaliatory or illegal discharge by these Defendants[.]" [16]

We find the circuit court's reasoning in this regard erroneous. It is undisputed that petitioner Perry was an at-will employee of DHHR; it is further undisputed that DHHR, through its Human Resources Director and on its own letterhead, advised petitioner Perry that she was discharged from employment. It is clear that she was discharged by her employer, DHHR.

This Court is cognizant, of course, of the complex inter-relationship between the Governor and his political appointees, who likewise serve at his will and pleasure. Moreover, we acknowledge that evidence indicating that the discharge was influenced or even directed, in whole or in part, by the desires of the Governor or his staff may certainly be material and relevant to issues of intent and motivation. However, we find it inescapable that, even if the Governor or his staff directed DHHR to discharge petitioner, the discharge was *in fact* effectuated by petitioner Perry's employer, DHHR. Accordingly, we find that the circuit court's conclusion that petitioner Perry's discharge claims were susceptible to summary judgment on this basis erroneous.

As to petitioner Taylor, we next address the circuit court's conclusion that her admitted violation of attorney-client privilege provided a legitimate, non-discriminatory, and non-retaliatory basis for her discharge and therefore mandated summary judgment as to

her discharge claims. In this regard, the circuit court's order briefly notes that the DHHR's investigation "uncovered independent and separate grounds" for Ms. Taylor's termination from DHHR, *i.e.* her e-mailing of privileged information to her husband. Citing only to respondent Fucillo's deposition testimony for support, the circuit court's order finds that "Mr. Fucillo averred that his decision to terminate Ms. Taylor was based upon the OIG report *and* Taylor's disclosure of attorney-client information." (emphasis added). Without further discussion, the circuit court's order then summarily concludes that respondents are entitled to summary judgment on "all Taylor's claims as there is no genuine issue of material fact that she breached attorney-client confidentiality."

We find the circuit court's factual finding in this regard to be patently incorrect. The portion of respondent Fucillo's deposition cited in the circuit court's order, in which he purportedly identifies petitioner Taylor's breach of the attorney-client privilege as a basis of her termination, quite simply states no such thing. In the cited testimony, counsel inquires of respondent Fucillo as to the basis of his termination of petitioner Taylor as follows:

> Q. Are there any other bases for your termination of Ms. Taylor other than the fact that Ms. Taylor's employment was "at will," that whatever happened in the July 13th—Friday, July 13th, 2012 telephone call, the Office of Inspector General report and the statements by Prosecuting Attorney—Kanawha County Prosecuting Attorney, Mr. Plants?
>
> A. That's it.

At no time in this cited testimony does respondent Fucillo identify the breach of attorney-client privilege as a basis of his termination of petitioner Taylor. Further, none of the specific bases of his decision to terminate—the DHHR investigative report,[17] the

---

**15.** Human Resources Director Clifton testified that he was instructed by the Governor's General Counsel, Peter Markham, to send a letter to petitioner Perry terminating her.

**16.** The circuit court's order, therefore, purports to dismiss petitioner Perry's *Harless*—based retaliatory discharge claims as well.

**17.** In the October 16, 2012, memo outlining the discovery of petitioner Taylor's disclosure of attorney-client information, the DHHR investigator states that "[t]his information will not be included in the report of investigation for [the RFP]."

referenced telephone call,[18] and the Prosecuting Attorney's statement—make any reference whatsoever to petitioner Taylor's breach of attorney-client privilege. In fact, it is unclear when the decision-makers involved became aware of the breach. *See* n.19, *infra.*

■ Importantly, however, even if respondents adduce other evidence suggesting that petitioner Taylor's discharge may have been based, in whole or in part, on her breach of the attorney-client privilege, this would merely create a factual issue for resolution by the trier of fact. Petitioners' employment claims-whether under the Human Rights Act, Whistle–Blower Law, or *Harless*—all employ effectively the same burden-shifting mechanism first articulated in Syllabus Point three, in part, of *Shepherdstown VFD v. W. Va. Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983):

> If the complainant is successful in creating [a] rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

*See* W. Va.Code § 6C–1–4(b) and (c) (1988) (requiring employee to show by a preponderance that he or she qualifies as a statutory "whistle-blower," upon which the burden

shifts to the defendant to prove that the complained of action "occurred for separate and legitimate reasons, which are not merely pretexts"); *Birthisel v. Tri–Cities Health Servs. Corp.*, 188 W.Va. 371, 377, 424 S.E.2d 606, 612 (1992) ("[I]n a retaliatory discharge case, the employer may defend the discharge by showing a legitimate, nonpretextual, and nonretaliatory reason for its action.").

As plainly evidenced above, the mere fact that respondents posit an arguably legitimate, non-pretextual, and non-retaliatory or discriminatory reason [19] for petitioner Taylor's discharge, does not entitle them to summary judgment. There is little question that whether petitioners were discharged for retaliatory or discriminatory reasons is replete with disputed issues of material fact which must be resolved by the fact-finder.

Having dispensed with the issues below which are common to each petitioner's discharge claims, we turn now to the findings and legal conclusions reached by the circuit court as pertain to each separate cause of action.

### 1. *Whistle–Blower Claims Pursuant to West Virginia Code § 6C–1–1 et seq.*

■ The West Virginia Whistle–Blower Law [20] contained in West Virginia Code § 6C–1–3(a) (1988) provides that

> [n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee by changing the employee's compensation, terms, conditions, location or privileges of employment because the

**18.** The referenced July 13, 2012, telephone call occurred before the DHHR investigation commenced, during which the attorney-client privilege breach was discovered; therefore, this telephone call could not refer to any such breach.

**19.** Whether, however, petitioner Taylor's breach actually constitutes a legitimate, nonpretextual and nonretaliatory reason for respondents' actions which may provide them with a liability defense, whether it is mere pretext, or is more properly characterized as "after-acquired evidence," which serves only as a damages defense, is a matter we leave to the fact-finder and circuit court, as appropriate. *See* Syl. Pt. 4, *Barlow v. Hester Inds., Inc.*, 198 W.Va. 118, 479 S.E.2d 628 (1996) ("In an employment discrimination case when an employer discovers, after terminating an employee, evidence of the employee's wrong-

doing that he or she committed before his or her discharge, a trial court may, with the exercise of reasonable discretion, admit such evidence for the limited purpose of determining which remedies are properly available to the plaintiff employee. Consistent with Rule 105 of the West Virginia Rules of Evidence, the trial court, upon admitting after-acquired evidence of an employee's wrongdoing, should instruct the jury as to the limited purpose of the evidence."). As noted, our review of the extensive record does not adequately reveal whether and when the decision-makers implicated herein were made aware of petitioner Taylor's breach of attorney-client privilege.

**20.** *See* W. Va.Code § 6C–1–1 ("This article shall be known, and may be cited, as the 'Whistle-blower Law.' ")

employee, acting on his own volition, or a person acting on behalf of or under the direction of the employee, makes a *good faith report* or is about to report, verbally or in writing, to the employer or appropriate authority an instance of *wrongdoing or waste.*

(emphasis added). The circuit court's order appears to conclude that petitioners cannot prevail on their whistle-blower claims because they cannot establish that they made a "good faith report" of an "instance of wrongdoing or waste," as those terms are defined by the statute. The circuit court's order further concludes that, as a matter of law, petitioners do not qualify as "whistle-blowers" because their alleged report of wrongdoing or waste was made "in the performance of their assigned responsibilities as counsel for DHHR." We address each issue in turn.

### a. Statutory Requirements

As set forth above, in short, the Whistleblower Law protects a public employee from being discharged for making a good faith report of wrongdoing or waste. West Virginia Code § 6C–1–2(d) (1988) defines a "good faith report" as "a report of *conduct* defined in this article as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has *reasonable cause to believe is true.*" (emphasis added). West Virginia Code § 6C–1–2(f) defines "waste" as "conduct or omissions which result in *substantial abuse, misuse, destruction or loss of funds or resources belonging to* or derived from federal, *state* or political subdivision *sources.*" (emphasis added). "Wrongdoing" is defined as

"a violation which is not of a merely technical or minimal nature of a federal *or state statute or regulation*, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." W. Va. Code § 6C–1–2(h) (emphasis added).

The order's extensive narrative purporting to demonstrate the absence of a genuine issue of material fact on these statutory factors appears to be based on its findings that 1) petitioners were not statutorily authorized, as per the procurement statutes, to involve themselves in the process and 2) petitioners' assessments of and recommendations to address the purported irregularities in the procurement were, in the court's opinion, incorrect.[21] Based on these ostensible findings, the circuit court then makes the legal conclusion that petitioners therefore did not "reasonably believe" their criticisms of the RFP were true and failed to demonstrate any wrongdoing or waste. Without attempting to parse out each flawed factual conclusion reached by the circuit court, it is clear that the circuit court either failed to note the obvious factual dispute regarding the undercurrent of motivation central to this litigation or completely misapprehended the view of the disputed evidence it must take in determining summary judgment.[22]

As described in the above Statement of Facts, in sum, petitioners contend they undertook a legal review of the DHHR advertising RFP in a good faith attempt to curtail or thwart any potential issues with the RFP and without knowledge that their involvement could be arguably construed as improper, given the status of the RFP. Respondents

---

**21.** In its order, the circuit court insistently details the statutory authority of the Director of Purchasing to review and approve the scoring attendant to an RFP and rhetorically argues about who is better situated to determine whether the proposals were properly scored—petitioner Taylor or the Director of Purchasing. The circuit court then finds the Director's approval of the scoring "dispositive" of the issue of whether petitioners had reasonable cause to believe that wrongdoing or waste had occurred. However, obtusely suggesting that the Director's approval of the scoring renders it impossible that any irregularities occurred lends little to the analysis. Whether petitioners were in fact correct about their concerns or whether their efforts in that

regard were improper in light of procurement procedure are matters to be determined at trial and may well inform the issue of the parties' motivations and intent with regard to their actions. We raise these issues simply to observe that nothing in our Whistle-blower Law requires an employee to have been ultimately correct in his or her assessment of the wrongdoing or waste. Quite the contrary, West Virginia Code § 6C–1–2(d) requires only that an employee have "reasonable cause to believe" the report of such conduct is true.

**22.** For example, the circuit court's order characterizes petitioners' assessment of the technical scores as "after-the-fact adjustments to reality."

suggest that petitioners' motives were not in good faith and demonstrated poor judgment, at best, or were an attempt to affect the outcome of the RFP process, at worst. In support, respondents make a plethora of arguments suggesting that petitioners should have known that their involvement was improper and that their legal "advice" based on the review was simply incorrect. There can be little doubt that there is, at a minimum, a genuine dispute of material fact over whether the petitioners' report was in "good faith," i.e. whether they reasonably believed the scoring was flawed or were attempting to interfere with the scoring.

As to the "wrongdoing" and "waste" factors, it is fairly inarguable that the entire subject matter of petitioners' activities and their resulting discharge concerns alleged "wrongdoing" and "waste" as defined by the statute. There is no dispute—by either party—that petitioners' respective discharges emanate from the RFP and their associated activities. The RFP process is governed by statute and ultimately results in an expenditure of public funds. Petitioners' allegations of irregularities in the procurement, if true, are frankly a nearly perfect depiction of the "waste" and/or "wrongdoing" defined in the whistle-blower statute. However, whether their activities were improper or improperly motivated, giving rise to a legitimate reason to discharge, or were protected whistle-blowing activities, discharge for which is a violation of West Virginia Code § 6C–1–3, raises complex questions of intent and motivation given the facts of this particular case, which can only be determined by a trier of fact. We therefore find that the circuit court erred in concluding that petitioners failed to demonstrate a genuine issue of material fact on their whistle-blower claim and concluding, as a matter of law, that their evidence cannot satisfy the statutory requirements.

#### b. "Job Duties" Exception

In addition to the foregoing statutory deficiencies, the circuit court's order further finds that petitioners cannot avail themselves of the Whistle-blower Law where their "reporting" was conducted in the "performance of their assigned responsibilities[.]" Although not expressly referenced as such by the parties or the circuit court, this line of reasoning is commonly referred to as a "job duties exception" in the whistle-blower context. The circuit court's order relies exclusively on a Minnesota Supreme Court case, *Kidwell v. Sybaritic, Inc.*, 784 N.W.2d 220 (Minn.2010), which examined the job duties exception to whistle-blower claims.

Despite relying solely on *Kidwell* for the proposition that one whose reporting is part of their assigned duties does not qualify as a "whistle-blower," the *Kidwell* court adopted no such rule. In fact, the court stated "[w]e ... reject as too broad the ... conclusion that, as a matter of law, 'an employee does not engage in protected conduct under the whistleblower act if the employee makes a report in fulfillment of the duties of his or her job.'" *Id.* at 226–27 (quoting *Kidwell v. Sybaritic, Inc.*, 749 N.W.2d 855, 866 (Minn. Ct.App.2008). Rather, the *Kidwell*) court noted the absence of a definition for a "good faith" report in the Minnesota statute [23] and reiterated its previous holding that a "good faith" report must be " 'made for the purpose of exposing an illegality[.]' " *Id.* at 227 (quoting *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 202 (Minn.2000)). The court further reiterated that, in determining good faith, both the "content of the report [and] the employee's purpose in making the report" must be considered. *Id.* (citing *Obst*, 614 N.W.2d at 200). Expounding on this previous holding, the *Kidwell* court simply found that "an employee's job duties *may* inform the question of the employee's purpose in making a report." *Id.* at 229–30 (emphasis added).

Like the *Kidwell* court, we observe that our Whistle-blower Law contains no job duties exception. And unlike the Minnesota statute as it existed at the time of *Kidwell*, West Virginia Code § 6C–1–2(d) does contain a definition for a "good faith report" as being one "made *without malice or consideration of personal benefit* and which the person making the report has reasonable cause to believe is true." (emphasis added). It is therefore implicit in our statu-

---

**23.** Minn.Stat. § 181.931 was amended in 2013 to include a definition of "good faith."

tory scheme that the *purpose* of a report of wrongdoing or waste is, in fact, germane to determining whether an employee has engaged in activity protected thereunder. However, we reject entirely the circuit court's summary conclusion that because petitioners may have been performing their assigned duties, they do not qualify as whistle-blowers under our statute. As noted above, the petitioners' motivation for reporting what they perceived to be wrongdoing or waste is a matter of disputed fact and therefore left to the trier of fact.

In addition to a complete misapplication of the authority it cited in this regard, the circuit court's order once again engages in the resolution of disputed factual issues, further illustrating the error of granting summary judgment. The order's conclusion that petitioners were merely performing their ordinary job duties highlights the factual dispute about why the petitioners performed the review—the key issue in the case. While respondents would urge that petitioners are precluded from making a whistle-blower claim because they were simply doing their jobs, they likewise ardently insist that petitioners had absolutely no business performing a legal review in the first instance because of the statutory procurement process. Likewise, the circuit court's order summarily concludes in one sentence that petitioners are not whistle-blowers because they were performing their "assigned responsibilities," yet rails against the petitioners for pages declaring their review and recommendations to be "a violation of the procedural rules that the Purchasing Division had issued pursuant to its legislative authorization." The order declares petitioners' recommendations to be

"unprecedented ... not authorized under any law, rule, regulation, or procedure." Quite simply, the petitioners' actions cannot at once be both monstrously out of line *and* nothing more than what they were hired to do; the trier of fact must make this determination and assess its impact on the parties' claims. Accordingly, we find the circuit court's grant of summary judgment on petitioners' whistle-blower claims to be erroneous.

### 2. Retaliatory Discharge Claims Pursuant to *Harless v. First Nat'l Bank*

■ In Syllabus Point 1 of *Harless*, this Court held:

The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge.[24]

(footnote added). In the instant case, petitioners have asserted a common-law retaliatory discharge claim under *Harless*; in support, they argue that their discharges contravene 1) their professional obligation to render "honest legal advice"; and 2) the West Virginia Ethics Act (hereinafter "Ethics Act"). In that regard, petitioners specifically assign as error the circuit court's determination that the Ethics Act may not form the foundation of a *Harless* claim and its broader conclusion that there exists no genuine issue of material fact as to their retaliatory discharge claim.[25]

---

**24.** In that regard, Mr. Fucillo's testimony to the effect that petitioners were fired *because* they were "at will" employees misses the point entirely and is therefore immaterial to the analysis. Referring to an employee as "at will" merely describes the type of employment agreement and provides the construct under which an employee may be discharged without cause. Being designated as an "at will" employee, however, in no way explains *why* an employee was discharged, which is the primary focus of discharge claims. Moreover, any suggestion that being an "at will" employee provides a blanket defense to a discharge claim is immaterial and nonsensical where there are allegations that a discharge was for a purpose proscribed by law. Our caselaw

makes clear that where an employee makes a prima facie case of discrimination or retaliation, "[t]he burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 483, 457 S.E.2d 152, 160 (1995) *holding modified on other grounds by Dodrill v. Nationwide Mut. Ins. Co.*, 201 W.Va. 1, 491 S.E.2d 1 (1996).

**25.** In contrast, however, petitioners do *not* specifically assign as error the circuit court's conclusion that, for purposes of their so-called "honest legal advice" retaliatory discharge claim, the Rules of Professional Conduct are not an appro-

■ Petitioners argue that the circuit court erred in finding that their cause of action for retaliatory discharge does not lie as pertains to the Ethics Act because it does not reflect a "substantial public policy," such as to be actionable under *Harless*.[26] In that regard, this Court has held that "[t]o identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions[.]" Syl. Pt. 2, *Birthisel*, 188 W.Va. 371, 424 S.E.2d 606. Moreover, "[i]nherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person." Syl. Pt. 3, *Id.*

The Ethics Act was enacted to "maintain confidence in the integrity and impartiality of the governmental process in the state of West Virginia" by ensuring the "[i]ndependence and impartiality of public officials and public employees[.]" W. Va.Code § 6B–1–2(a) and (b) (1989). The Ethics Act further declares that "high moral and ethical standards among public officials and public employees are essential to the conduct of free government," and that such ethical standards "will improve standards of public service" as well as the "faith and confidence of the people of this state in their public officials and public employees." W. Va.Code § 6B–1–2(d). To achieve these goals, the Act sets forth comprehensive and very *specific* ethical standards for public officials and employees regarding use of public office for private gain, gifts, interests in public contracts, confidential information, prohibited representation, practice before a board,

---

priate source of a substantial public policy of the State. Petitioners identify no such recognized cause of action; however, rather than addressing this threshold, legal issue as to the existence of such a claim, petitioners focus their argument, instead, on the circuit court's alternative conclusion that their legal advice was incorrect. In fact, petitioners erroneously state that "the court did not hold that such claims can never be the basis for a finding of public policy" and merely assert that the circuit court erred in granting summary judgment where disputed factual issues exist.

While the circuit court's order admittedly engages in a lengthy debate about whether petitioners or the Purchasing Director was more knowledgeable about RFPs, the order expressly finds at the outset of the discussion that "[f]or purposes of the Plaintiffs' claims against DHHR, the source of [the] ... 'specific guidance' [required for a substantial public policy to give rise to a *Harless* claim] cannot be the Rules of Professional Conduct[.]" However, as noted, petitioners neither assigned this legal conclusion as error nor briefed the highly debatable issue of whether the Rules of Professional Conduct reflect a substantial public policy upon which a common-law retaliatory discharge claim may be based. *Compare Balla v. Gambro, Inc.*, 145 Ill.2d 492, 164 Ill.Dec. 892, 584 N.E.2d 104, 110 (1991) ("An attorney's obligation to follow these Rules of Professional Conduct should not be the foundation for a claim of retaliatory discharge."), *with Gen. Dynamics Corp. v. Superior Court*, 7 Cal.4th 1164, 32 Cal.Rptr.2d 1, 876 P.2d 487, 501 (1994) ("[A]ttorneys should be accorded a retaliatory discharge remedy in those instances in which mandatory ethical norms embodied in the Rules of Professional Conduct collide with illegitimate demands of the employer and the attorney insists on adhering to his or her clear professional duty." (emphasis removed)).

Inasmuch as petitioners neither assigned as error, nor properly briefed this substantial legal issue, we decline to disturb the circuit court's conclusion that such claim is not properly made. *See Cooper v. City of Charleston*, 218 W.Va. 279, 290, 624 S.E.2d 716, 727 (2005) (" '[A]lthough we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal.' " (citations omitted)); *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 135, 140 n. 10, 506 S.E.2d 578, 583 n. 10 (1998) ("Issues not raised on appeal or merely mentioned in passing are deemed waived.").

26. The circuit court's order also contains an extensive discussion finding that it has no subject matter jurisdiction under the Ethics Act because of its exclusivity and the absence of a private cause of action expressly provided for in the Act. We may dispense quickly with this misplaced analysis. It is plain that petitioners do not attempt to assert a private cause of action under the Act, but rather, have alleged a common law retaliatory discharge claim pursuant to *Harless*. *Harless* requires that an employee identify a substantial public policy, the contravention of which motivated his or her employer's decision to discharge. Petitioners' identification of the Ethics Act as a source of such substantial public policy is in no way an attempt to assert a private cause of action under the Act, nor has our caselaw ever required that the source of public policy provide for a private cause of action to form the basis of a *Harless* action. Accordingly, the circuit court's analysis of subject matter jurisdiction and the efficacy of permitting a private cause of action under the Act is inapposite.

agency, commission or department, employment by regulated persons and vendors, Legislative voting, limitations on voting, participation in licensing and rate-making proceedings, and compensation and expenses. W. Va.Code § 6B-2-5 (2008).

We find it unnecessary, however, to determine whether the Ethics Act reflects a "substantial public policy" for purposes of resolving petitioners' claim inasmuch as they have failed to identify the manner in which their discharge contravenes the Act in any event. As stated above, *Harless* makes unlawful a discharge which is motivated by a desire to contravene a substantial public policy; therefore, petitioners must provide sufficient evidence to establish that their discharge was motivated by respondents' desire to contravene the Ethics Act. However, petitioners make no *specific* allegation that the respondents' actions surrounding the RFP violated any express prohibition contained in the Ethics Act nor that petitioners' actions relative to the RFP were specifically mandated or protected by the Ethics Act. Petitioners tellingly cite to no operative portion of the Ethics Act specifically governing the conduct of public officials or employees, as extensively set forth in West Virginia Code § 6B-2-5, which either prohibited respondents' conduct or protected theirs. Rather, petitioners merely cite to a descriptive sentence in the Ethics Act's statement of purpose, declaration and intent: "The decisions and actions of public officials and public employees must be made free from undue influence, favoritism or threat, at every level of government."[27] W. Va.Code § 6B-1-2(a). From this, petitioners argue that respondents "used their respective position to unduly influence petitioners into changing their legal opinions." Petitioners further vaguely contend that "it is difficult to argue against the proposition that alerting one's agency client to the possibility of a court challenge is consistent with the Ethics Act."

We find petitioners' position untenable. As this Court has recently observed, "a *Harless*-based action requires

more than simply raising the [spectre] of a potentially governing law." *Frohnapfel v. ArcelorMittal USA LLC,* 235 W.Va. 165, 170, 772 S.E.2d 350, 355 (2015) "The mere citation of a statutory provision is not sufficient to state a cause of action for retaliatory discharge without a showing that the discharge violated the public policy that the cited provision clearly mandates." *Swears v. R.M. Roach & Sons, Inc.,* 225 W.Va. 699, 705, 696 S.E.2d 1, 7 (2010). In rejecting professional licensing standards and regulations as evincing a substantial public policy, this Court observed that

> [n]either of these provisions contain any specific guidance. Their general admonitions as to the requirement of good care for patients by social workers do not constitute the type of substantial and clear public policy on which a retaliatory discharge claim can be based. If such a general standard could constitute a substantial public policy, it would enable a social worker to make a challenge to any type of procedure that the worker felt violated his or her sense of good service.

*Birthisel,* 188 W.Va. at 377–78, 424 S.E.2d at 612–13. Therefore, it is clear that to sustain a *Harless* action, an employee must identify a substantial public policy which is *specifically* implicated by the conduct which gave rise to the discharge and that his or her discharge was motivated by a desire to thwart such policy.

In that regard, the Ethics Act is not an esoteric directive to act ethically; it sets forth very specific ethical standards to govern the conduct of public officials and employees in a variety of circumstances. In spite of these specific directives, petitioners identify neither actions of respondents which were specifically and expressly prohibited by the Ethics Act or actions which they undertook which are specifically protected by the Ethics Act. Petitioners fail to demonstrate how the Act is implicated at all, other than suggesting that respondents' employment actions were in some measure "unethical." Accordingly, petitioners have failed to identify

---

**27.** In effect, petitioners appear to contend that the discharge itself, rather than the protected conduct, implicates the Ethics Act.

in what way their discharge was motivated by respondents' desire to contravene the Ethics Act. In point of fact, it is respondents who contend that *petitioners'* actions appeared potentially unethical. We therefore affirm the circuit court's grant of summary judgment as to petitioners' retaliatory discharge claims.

### 3. Gender Discrimination Claims Pursuant to W. Va.Code § 5–11–9

Finally, insofar as their employment claims are concerned, petitioners assert that they were discriminated against[28] due to their gender in violation of the Human Rights Act as set forth in West Virginia Code § 5–11–9 (1998). This Code section declares it unlawful for an employer to "discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment[.]" W. Va.Code § 5–11–9(1). "Discrimination" means to "exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, sex, age, blindness, disability or familial status[.]" W. Va.Code § 5–11–3(h) (1998).

▮▮▮▮▮ Our paradigm for surviving summary judgment in a discrimination case is well-established and long-standing:

In order to make a prima facie case of employment discrimination under the West Virginia Human Rights Act, W. Va.Code § 5–11–1 *et seq.* (1979), the plaintiff must offer proof of the following:

(1) That the plaintiff is a member of a protected class.

(2) That the employer made an adverse decision concerning the plaintiff.

(3) But for the plaintiff's protected status, the adverse decision would not have been made.

Syl. Pt. 3, *Conaway v. Eastern Assoc. Coal Corp.*, 178 W.Va. 164, 166, 358 S.E.2d 423, 425 (1986). As previously discussed herein, after a prima facie case has been made, "the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the [adverse employment action]." Syl. Pt. 3, in part, *Shepherdstown Volunteer Fire Dep't*, 172 W.Va. 627, 309 S.E.2d 342. If the presumption is rebutted, "then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination." *Id.*

Petitioner Perry argues that she set forth a prima facie showing of discrimination by establishing that she posed a hypothetical discrimination claim to DHHR's EEO officer and Human Resources Director regarding respondent Fucillo's receipt of mileage reimbursement. Apparently, a prior Secretary had refused to allow petitioner Perry to charge mileage from her home in Logan to her office in Charleston; respondent Fucillo, however, was permitted to charge mileage for travel to Charleston in his position as Commissioner for the Bureau of Children and Families inasmuch as he was based in Fairmont. Petitioner Taylor asserts that she likewise made a prima facie showing of discrimination by establishing that respondent Fucillo—against whom she successfully competed for the position DHHR General Counsel—temporarily replaced her with a male attorney. Further, petitioners suggest that their collective administrative reassignment and alleged mistreatment and denigration during the pendency of that reassignment[29] was reflective of respondents' gender animus.

Respondents counter that, as to petitioner Perry, respondent Fucillo did not know about her hypothetical discrimination claim at the time he initiated her administrative leave and therefore her claim could not have motivated

---

**28.** As to this claim, it is unclear whether the adverse employment action of which petitioners complain is limited to their administrative reassignment, ultimate discharge, or both. While our analysis in this case is unaffected by this ambiguity, we remind counsel that the parties should not be left to guess what particular adverse employment action(s) is being challenged as purportedly unlawful. Counsel should take care to clearly articulate the specific adverse employment action(s) which forms the basis of their claims.

**29.** Petitioners complain that they were forced to share a small cubicle with inadequate support and were assigned menial "busywork" during their reassignment.

**568**

his actions. In support, respondents cite to the affidavit of Dawn Adkins, the EEO officer with whom petitioner Perry discussed the hypothetical claim, who averred that petitioner Perry never identified herself as the complainant in discussing the hypothetical claim. As to petitioner Taylor, respondents argue that simply being replaced with a male is insufficient to make a prima facie showing of discrimination. Respondents argue heavily, and the circuit court's order concurs, that petitioner Taylor's ultimate replacement by a female and the similar treatment of John Law, a male, vitiates her gender claim.

■ This Court has held that

[i]n most discrimination cases, once a plaintiff's allegations and evidence create a *prima facie* case (showing circumstances that permit an inference of discrimination on an impermissible bias), unless the employer comes forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.

Syl. Pt. 3, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995). More pointedly, we have explained that "[a]lthough the plaintiff has the ultimate burden of proving elements of the claim of discrimination by a preponderance of the evidence, the showing the plaintiff must make as to the elements of the *prima facie* case in order to defeat a motion for summary judgment is *de minimis*." Syl. Pt. 4, in part, *Hanlon.* To satisfy the "de minimis" showing, an employee must proffer evidence "sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the circuit

court itself to decide what inferences should be drawn." *Id.*

■ In spite of the *de minimis* showing required to sustain a discrimination claim, we agree with the circuit court's assessment that petitioners have failed to proffer evidence from which a rational finder of fact may infer discrimination on the basis of petitioners' gender. There is no evidence that the decision-makers involved in petitioner Perry's adverse employment actions were even aware of her "hypothetical" claim, much less any evidence that such a claim was tied in any fashion to respondents' decisions regarding her employment. Petitioner Taylor's claim similarly fails in its required *de minimus* showing: simply being temporarily replaced by a male, in absence of more, is insufficient grounds from which a rational trier of fact could infer gender discrimination.[30] Moreover, given petitioners' all-consuming characterization of their case as motivated by reprisal for their activities relative to the RFP, we conclude that a rational trier of fact could not discern any gender-motivated aspect to the case as presented by petitioners themselves. Therefore, we affirm the circuit court's grant of summary judgment as to petitioners' gender discrimination claims.

### C. False Light Invasion of Privacy Claims

■ Finally, petitioners contend that the circuit court erred in concluding that they failed to produce any evidence in support of their false light invasion of privacy claims. Petitioners appear to argue that because the investigation and resultant search warrant contained allegedly false information and were unlawfully motivated, respondents' actions caused publicity which placed them in a false light. The centerpiece of petitioners'

**30.** The circuit court's order further finds that petitioners failed to produce evidence supporting a "disparate impact" claim. Our review of the record, however, fails to uncover any indication whatsoever that petitioners are attempting to advance a disparate impact claim. Petitioners do not specifically address this aspect of the circuit court's order. As we have explained,

[d]isparate impact theory does not require proof of discriminatory motive. Unlike disparate treatment analysis, which turns on illegal

motive, disparate impact turns on discriminatory *effect*. To prevail under disparate impact, the plaintiff must show that the defendant's facially neutral policy has a disproportionate adverse impact on the basis of the protected trait.

*W. Va. Univ./W. Va. Bd. of Regents v. Decker*, 191 W.Va. 567, 572, 447 S.E.2d 259, 264 (1994). Nowhere in the extensive record do we discern a "facially neutral policy" implicated in petitioners' discrimination claims.

evidence on this claim is the search warrant drafted by Inspector Bishop at the request of the Prosecuting Attorney, which was ultimately released to the media. The circuit court's grant of summary judgment on this claim appears in large part to be based upon the legal conclusion [31] that respondents are entitled to the defense of newsworthiness inasmuch as petitioners are "public figures" and the RFP was a matter of "legitimate public interest." On appeal, the parties similarly focus on the presence or absence of privilege, as well as the purported falsity of the search warrant.

■■■■ *Crump v. Beckley Newspapers, Inc.*, 173 W.Va. 699, 320 S.E.2d 70 (1983) is West Virginia's tour *de force* of privacy law and it is almost entirely within its confines where we find the source of the circuit court's award of summary judgment as to these claims. With respect to petitioners' stated "false light invasion of privacy" claims, Syllabus Point twelve of *Crump* provides that "[p]ublicity which unreasonably places another in a false light before the public is an actionable invasion of privacy." [32] However, in that regard, the *Crump* Court explained

that the two defenses of "newsworthiness and consent[ ] allow a defendant to avoid all liability once established." *Id.* at 712, 320 S.E.2d at 83.[33] With regard to the defense of newsworthiness, "[t]here are two classes of newsworthy subjects which are privileged under privacy law: public figures and matters of legitimate public interest." *Id.* To that end, the circuit court's order slogs through these doctrines intertwining the concepts of "public figures," [34] "public officials" and "matters of public interest." However, we find that it is unnecessary to follow the circuit court's order down the proverbial "rabbit hole" to determine if respondents enjoy a qualified privilege in this instance inasmuch as petitioners' claims fail on a more fundamental basis.

■■■ The Restatement (Second) of Torts § 652E (1977) sets forth the elements of a false light invasion of privacy claim as follows:

One who *gives publicity to* a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

---

31. The circuit court's order on this issue vacillates wildly between various factual and legal issues, many of which are not even implicated in petitioners' false light invasion of privacy claim. *See* n. 32, *infra*.

32. Syllabus Point eight of *Crump* holds that

[a]n "invasion of privacy" includes (1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public.

173 W.Va. 699, 320 S.E.2d 70. Rather than focusing on petitioners' "false light" invasion of privacy claim, the order conflates the four categories of invasion of privacy recognized in West Virginia, discussing "appropriation" of petitioners' "likenesses" and "publication" all of which concern the three other forms of invasion of privacy recognized in West Virginia—none of which were pled in this case. The circuit court's order also curiously and erroneously suggests that false light invasion of privacy extends only to those "employed by a newspaper."

33. Both of these doctrines are *qualified* privileges, which "may be lost through abuse, excess or actual malice." *Crump*, 173 W.Va. at 712, 320 S.E.2d at 84 ("As with the 'public figure'

doctrine, the 'public interest' doctrine acts as a qualified privilege which immunizes a publisher from liability so long as abuse of privilege or actual malice are not present.").

34. "The circuit court ultimately appeared to conclude that petitioners were "involuntary" public figures. This Court has explained that

[i]n a claim for defamation, there are three recognized categories of public figures: (1) "involuntary public figures," who become public figures through no purposeful action of their own; (2) "all-purpose public figures," who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; and (3) "limited purpose public figures," who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues.

Syl. Pt. 3, *Wilson v. Daily Gazette Co.*, 214 W.Va. 208, 588 S.E.2d 197 (2003). However, the Court has likewise observed the United States Supreme Court's admonition that "only a handful of courts have ever found a plaintiff to be an involuntary public figure" and "'instances of truly involuntary public figures must be exceedingly rare.'" *Id.* at 219, 588 S.E.2d at 208 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

(emphasis added). Respondents argue, albeit briefly, that they did not disseminate any information to the media. Respondents note, and petitioners apparently concede, that they did not release the search warrant to the media. Respondents further indicate that they repeatedly declined to speak to the media on the basis that the situation constituted a "personnel matter," offering multiple instances of precisely such a response being reported in the media.

As stated above, before this Court, petitioners focus exclusively on the privilege issues and whether the content of the search warrant contained truthful information. In so doing, they fail entirely to set forth evidence which would create a dispute about whether respondents' "gave publicity to" any of the information which aggrieves them. Tellingly, in characterizing the respondents' role relative to publicizing the purported false information, petitioners state merely that respondents "unleashed" a "maelstrom of publicity." However, petitioners have failed to identify a single instance where respondents publicized "false light" information to the media or otherwise.

With respect to the search warrant, petitioners focus on Inspector Bishop's involvement in drafting the search warrant, with which they take issue in some degree.[35] However, the Prosecuting Attorney offered an affidavit averring that his office reviewed and approved the search warrant, utilizing its independent judgment in tendering the search warrant for issuance and execution. Moreover, petitioners' counsel below conceded that the Prosecuting Attorney released the search warrant to the media, which warrant was already a matter of public record on

file with the Office of the Circuit Clerk of Kanawha County. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494–95, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) ("Thus even the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record.").

We therefore conclude that petitioners have failed to offer evidence of a genuine issue of material fact regarding the requirement that respondents have "given publicity to" the alleged "false light" information. Accordingly, we affirm the circuit court's award of summary judgment on petitioners' false light invasion of privacy claims.

## IV. CONCLUSION

Based upon the foregoing, we affirm the circuit court's grant of summary judgment as to petitioners' retaliatory discharge, gender discrimination claims under the Human Rights Act, and false light invasion of privacy claims, but conclude that the circuit court erred in granting summary judgment in favor of respondents on petitioners' whistleblower claims and therefore reverse the May 16, 2014, and June 13, 2014, orders of the Circuit Court of Kanawha County to that extent and remand for further proceedings.

Affirmed in part and reversed and remanded in part.

Justice DAVIS, deeming herself disqualified, did not participate in the decision of this case.

Chief Justice KETCHUM concurs and reserves the right to file a separate opinion.

Justice BENJAMIN concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

Chief Justice KETCHUM, concurring:

I agree with the majority that the plaintiffs failed to identify how their discharges contra-

---

**35.** Despite the extensively detailed nine-page search warrant, petitioners specifically identify only two statements contained in the search warrant which they maintain is false or disputed: one regarding whether Mr. Law and petitioner Taylor discussed concerns about the contract go-

ing to an out of state vendor and one regarding the reason the award of the contract was ultimately delayed. The third statement with which they take issue—where petitioner Taylor's husband was previously employed—they simply characterize as "irrelevant."

vened the Ethics Act. They have no retaliatory discharge claim based on the Ethics Act. However, it is clear that the plaintiffs can, in fact, assert a valid retaliatory discharge claim under our Procurement Statute and should be permitted to amend their pleadings to conform to the evidence in this case. It is plain from the evidence that there is a substantial public policy relating to the plaintiffs' discharges under the statutory procurement procedures contained in West Virginia Code § 5A-3-1 et seq. The entirety of plaintiffs' case centers around their contention that they were discharged for investigating and revealing what they believed to be irregularities or errors with the administration and execution of the RFP process, as governed by statute. If a jury believes they were discharged for this reason, they have proven a retaliatory discharge.

The procurement statutes unquestionably reflect a substantial public policy of the State of West Virginia. The purpose of the statutory procedures set forth for the Purchasing Division of the Department of Administration is contained in West Virginia Code § 5A-3-1 and provides, in part, that the statutory procedures are established to, "provide for increased public confidence in the procedures followed in public procurement," to "ensure the fair and equitable treatment of all persons who deal with the procurement system of this state," and to "provide safeguards for the maintenance of a procurement system of quality and integrity." As this Court recently explained:

> These laws were enacted to ensure that tax dollars for public works are spent wisely and to guard against public officials entering into contracts because of favoritism. See generally SE/Z Constr., L.L.C. v. Idaho State Univ., 140 Idaho 8, 89 P.3d 848, 853 (2004) (holding purpose of competitive bidding statutes is to safeguard public funds and prevent favoritism, fraud and extravagance in their expenditure). One of the overriding purposes of our procurement laws is "to maximize to the fullest extent practicable the purchasing value of public funds[.]" W. Va.Code § 5A-3-1(a)(7). The essential safeguard of competitive bidding is to maintain quality and integrity in the procurement system. W. Va.Code § 5A-3-1(a)(9).

Wiseman Const. Co. v. Maynard C. Smith Const. Co., 236 W.Va. 351, 779 S.E.2d 893 (2015).

In a clear indication that the statutory procurement procedures reflect a substantial public policy of the State, the Legislature criminalizes certain conduct relative to the provisions of the procurement statutes in West Virginia Code § 5A-3-28 through -31. As stated, the express purpose thereof is to "promote equal and fair bidding for the purchase of commodities and services by the state, to eliminate fraud in the procurement of commodities and services by the state." W. Va.Code § 5A-3-30(a). The Legislature's expression of purpose and detailed prescription of the State's statutory purchasing scheme for expenditures of public funds clearly constitutes a substantial public policy of the State. Discharge in contravention thereof may form the basis of a Harless retaliatory discharge claim.

Since the procurement statutes provide plaintiffs with a retaliatory discharge cause of action, they should be permitted to amend their pleadings to conform to the evidence. West Virginia Rule of Civil Procedure 15(b) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time[.]

Moreover, this Court has held:

> [M]otions to amend should always be granted under Rule 15 when: (1) the amendment permits the presentation of the merits of the action; (2) the adverse party is not prejudiced by the sudden assertion of the subject of the amendment; and (3) the adverse party can be given ample opportunity to meet the issue.

Syl. pt. 3, in part, Rosier v. Garron, Inc., 156 W.Va. 861, 199 S.E.2d 50 (1973), overruled on other grounds by Bradshaw v. Soulsby, 210

W.Va. 682, 558 S.E.2d 681 (2001) (emphasis added). While plaintiffs did not expressly plead the procurement statutes as the source of the substantial public policy and that their discharge was in contravention of these statutes, it is obvious that all parties and the circuit court understand that to be the case.

The circuit court dedicates the bulk of its order discussing the retaliatory discharge claim in relation to the procurement statutes, clearly indicating that this statutory scheme best represents the substantial public policy plaintiffs' discharge allegedly contravened. Moreover, the parties' arguments and briefing, both before this Court and below, make plain that all parties to this litigation have operated with the understanding that plaintiffs contend that they were discharged for attempting to alert respondents to perceived irregularities in the RFP—an act that, if true, would clearly be in contravention of the procurement statutes. In fact, the respondents' brief and the order prepared by them focus *nearly exclusively* on whether it was appropriate for plaintiffs to become involved with the RFP and whether their assessment of the RFP was correct. Plaintiffs should therefore be permitted to present this case to the jury under both the whistle-blower statute and our common law on retaliatory discharge.

Accordingly, I respectfully concur.

BENJAMIN, Justice, concurring, in part, and dissenting, in part:

I concur with the majority opinion insofar as it affirms the circuit court's grant of summary judgment to the respondents on the petitioners' gender discrimination, retaliatory discharge, and false light invasion of privacy claims. However, I dissent to the majority opinion insofar as it reverses the circuit court's grant of summary judgment to the respondents on the petitioners' whistle-blower claims.

While the bulk of the majority opinion on the petitioners' whistle-blower claims is taken up exposing the flaws in the circuit court's summary judgment order, the majority opinion ignores the chief flaw: the petitioners completely failed to offer evidence below to support their whistle-blower claims. In

*Painter v. Peavy,* 192 W.Va. 189, 192–93, 451 S.E.2d 755, 758–59 (1994), this Court explained that "the party opposing summary judgment must satisfy the burden of proof by offering more than a mere 'scintilla of evidence,' and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor." (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In addition, this Court has indicated that "mere allegations are insufficient in response to a motion for summary judgment to show that there is a genuine issue for trial." *Miller v. City Hosp., Inc.,* 197 W.Va. 403, 412, 475 S.E.2d 495, 504 (1996) (internal quotation marks and brackets omitted and citation omitted). The circuit court's summary judgment order was proper because the petitioners offered nothing more than mere allegations to support their claims.

I believe that the circuit court correctly concluded that the petitioners cannot prevail on their whistle-blower claims because they cannot establish that they made a "good faith report" of an "instance of wrongdoing or waste," as those terms are defined in the Whistle-blower Law. "Waste" is defined in the Law as "an employer or employee's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from federal, state or political subdivision sources." W. Va.Code § 6C–1–2(f) (1988). The petitioners have not brought forth any evidence that the evaluation committee's scoring of the technical bid in this case resulted in substantial abuse, misuse, destruction, or loss of State funds. Instead, the petitioners speculated that the committee's scoring of the technical part of the bid *could* result in waste by causing a legal challenge, a need to re-score the bid, etc. Such speculation is nothing more than a mere allegation and is not sufficient to survive a summary judgment motion. Further, the Law defines "wrongdoing," in part, as "a violation which *is not of a merely technical or minimal nature.*" W. Va.Code § 6C–1–2(h) (emphasis added). The disagreement at issue was over the scoring of the *technical* part of a bid. Therefore, even if the petitioners had a good faith belief that

the evaluation committee improperly scored the technical part of the bid, the petitioners have failed to produce evidence that the improper scoring of the bid constituted wrongdoing under the Law. Quite simply, the petitioners disagreed with how the committee scored the technical part of the bid. Such a disagreement does not come close to providing a basis for a claim under the Whistleblower Law. Accordingly, this Court should affirm the circuit court's summary judgment order with regard to the petitioners' whistleblower claims.

In sum, the petitioners have wholly failed to offer sufficient evidence for a reasonable jury to find in their favor on their whistleblower claims. Therefore, I dissent to the majority opinion insofar as it reverses the circuit court's grant of summary judgment to the respondents on these claims. Otherwise, I concur to the majority opinion insofar as it affirms the circuit court's grant of summary judgment to the respondents on the petitioners' gender discrimination, retaliatory discharge, and false light invasion of privacy claims.