IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 18-0026

_____

FILED

June 3, 2019

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WEST VIRGINIA DIVISION OF NATURAL RESOURCES,
JERRY JENKINS, BRADFORD DEBORD, AND STEPHEN ANTOLINI,
Defendants Below, Petitioners

V.

STEVEN DAWSON AND ANGELA DAWSON,
Plaintiffs Below, Respondents

_____

Appeal from the Circuit Court of Hampshire County
The Honorable C. Carter Williams, Judge
Civil Action No. 15-C-80

AFFIRMED, IN PART; REVERSED, IN PART; AND
REMANDED

_____

Submitted: March 13, 2019
Filed: June 3, 2019

Keith C. Gamble
Nathan A. Carroll
Pullin, Fowler, Flanagan, Brown &
   Poe, PLLC
Morgantown, West Virginia
Attorneys for the Petitioners

Jerry D. Moore
Jared T. Moore
The Moore Law Firm, PLLC
Franklin, West Virginia
Attorneys for the Respondents

JUSTICE JENKINS delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.    "'A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the "collateral order" doctrine.' Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009)." Syllabus point 1, *City of Saint Albans v. Botkins*, 228 W. Va. 393, 719 S.E.2d 863 (2011).

2.    "'This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court.' Syllabus Point 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W. Va. 80, 576 S.E.2d 807 (2002)." Syllabus point 2, *West Virginia State Police v. Hughes*, 238 W. Va. 406, 796 S.E.2d 193 (2017).

3.    "The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition." Syllabus point 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996).

4.	"'In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1 *et seq.*, and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.'  Syl. Pt. 6, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995)."  Syllabus point 7, *West Virginia Regional Jail & Correctional Facility Authority v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

5.	"To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability."  Syllabus point 11, *West Virginia Regional Jail & Correctional Facility Authority v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

6.	"If the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or

can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment.  To the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability, but the public employee or official is not entitled to immunity in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992) and its progeny.  If the public official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior* along with the public official or employee."  Syllabus point 12, *West Virginia Regional Jail & Correctional Facility Authority v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

7.      "A government employer implicates its employee's liberty interest in his/her good name when the following elements are alleged: (1) a stigmatizing statement; (2) which was false; (3) was published, or made accessible to the public; (4) in connection with a serious adverse employment action.  When these elements are met, the employee must be afforded procedural safeguards under Article III, Section 10 of the West Virginia Constitution."  Syllabus point 6, *West Virginia Department of Education v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017).

iii

**Jenkins, Justice:**

The Petitioners, the West Virginia Division of Natural Resources ("the DNR"); and Jerry Jenkins ("Col. Jenkins"),[1] Bradford DeBord ("Maj. DeBord"),[2] and Stephen Antolini ("Sgt. Antolini")[3] (collectively "the DNR employees"), appeal a December 8, 2017 order of the Circuit Court of Hampshire County that denied their motion for summary judgment on the ground of qualified immunity. In the underlying civil action filed by Respondent, Steven Dawson ("Mr. Dawson")[4], Mr. Dawson alleged that his former employer, the DNR, and its employees, Col. Jenkins, Maj. DeBord, and Sgt. Antolini, "committed alleged acts of defamation, false light, infringement of a liberty interest without due process, and reckless infliction of emotional distress, along with claims of loss of consortium and punitive damages." On the DNR's and the DNR employees' motion for summary judgment asserting qualified immunity, the circuit court found that there is a genuine issue of material fact as to whether Mr. Dawson's liberty interest was implicated, and, if so, whether he was afforded due process; whether the DNR and the DNR employees were in violation of Mr. Dawson's clearly established rights of which a reasonable person

---

[1] Col. Jenkins was sued in the underlying matter individually and in his capacity as Colonel and Chief of the Law Enforcement Section of the DNR.

[2] Maj. DeBord was sued in the underlying matter individually and in his capacity as Major and Coordinator of the Law Enforcement Section of the DNR.

[3] Sgt. Antolini was sued in the underlying matter individually and in his capacity as Sergeant of the Law Enforcement Section of the DNR.

[4] In the underlying matter, Mr. Dawson's wife, Angela Dawson, was also a named plaintiff. Mr. and Mrs. Dawson are also both named parties in this appeal; therefore, Mr. and Mrs. Dawson will be referred to collectively as "the Dawsons."

1

would have known; whether the DNR and the DNR employees acted maliciously in their investigation of Mr. Dawson; and whether the actions of the DNR employees were within the scope of their employment.

On appeal, the DNR and the DNR employees raise the following issues: (1) the circuit court erred by failing to find qualified immunity because (a) there is no evidence of a violation of any clearly established statutory or constitutional right or law of which a reasonable person would have known, and (b) there is no evidence of conduct on behalf of the DNR and the DNR employees that could be characterized as fraudulent, malicious, or oppressive; (2) no genuine issues of material fact existed, and no reasonable juror could find the DNR employees acted outside their official capacity as DNR officers; and (3) the circuit court improperly found that the DNR and the DNR employees' motion for summary judgment, filed after the close of discovery, was inconsistent with the provisions of *Maston v. Wagner*, 236 W. Va. 488, 781 S.E.2d 936 (2015), which encourages a ruling on qualified immunity early in the proceedings.

Having considered the briefs submitted on appeal, the appendix record, the parties' oral arguments, and the applicable legal authority, we find no error in the circuit court's decision that there are genuine issues of material fact as to whether the DNR and the DNR employees' acts or omissions were fraudulent, malicious, or oppressive and whether the individual DNR employees acted outside of their scope of employment. We further find no error in the circuit court's findings regarding the timing of the motion for

2

summary judgment.  Therefore, we affirm as to those three issues.  However, we find that the Dawsons cannot demonstrate a violation of a clearly established statutory or constitutional right or law of which a reasonable person would have known.  Accordingly, we reverse the circuit court's decision as to that issue and direct the circuit court to enter summary judgment in favor of the DNR and the DNR employees as to that issue only and remand for further proceedings consistent with this opinion.

## I.

### FACTUAL AND PROCEDURAL HISTORY

In summer 2014, the DNR was investigating the offenses of illegal bear hunting and prohibited driving of motor vehicles within the Nathanial Mountain Wildlife Management Area ("WMA") in Hampshire County, West Virginia.  Mr. Dawson was employed by the DNR as a natural resources police officer.  Although Mr. Dawson was assigned to Hardy County, West Virginia, he assisted the Hampshire County investigation at the request of DNR Officer Terry Srout ("Officer Srout").  On September 7, 2014, Officer Srout and Mr. Dawson placed two game-trail cameras in the WMA.[5]  The cameras were set along trails where they believed there was illegal driving activity.  Officer Srout and Mr. Dawson retrieved the cameras on September 21, 2014.  One camera, a Moultrie-brand camera (the "Moultrie Camera"), contained eleven photos that showed two vehicles:

---

[5] There was a third camera also set up that same day; however, it is not significant for the purposes of this appeal.

3

(1) a gray/silver Dodge truck, that the investigating officers determined belonged to Ralph Buckley, and (2) a white Sport Utility Vehicle. Upon inspection of the second camera, a Bushnell-brand camera (the "Bushnell Camera"), it was discovered that the memory card was missing. However, upon further inspection, Officer Srout discovered that the Bushnell Camera did contain twelve photos that were saved to the internal drive. The photos were timestamped, but the dates and times did not correspond with the time the Bushnell Camera had been deployed by Officer Srout and Mr. Dawson. According to the circuit court, "[t]hese photos reveal a person very close to the lens of the camera, with the individual's clothing visible. It also appears that a hand is covering or shielding the camera lens."

Mr. Dawson contends that he and other investigating officers believed that the driver of the Dodge truck was Ralph Buckley and he stole the memory card from the Bushnell Camera. They obtained a search warrant based upon that belief from the Hampshire County Magistrate Court.[6] Mr. Dawson had been the one to complete the search warrant affidavit. Once Mr. Dawson obtained the search warrant, he and the other investigating officers attempted to execute it at the Buckley residence; however, Ralph Buckley was not home. Mr. Dawson then called Jeremy Buckley, Ralph Buckley's son, and informed him that he had a search warrant for Ralph Buckley's property. Ralph Buckley returned home and spoke to Mr. Dawson. At some point, Mr. Dawson had an

---

[6] However, the circuit court noted that "[Mr.] Dawson has admitted herein that, from the Bushnell photos, he cannot see the Buckley truck, Ralph or Jeremy Buckley (Ralph's son), an SD card, and/or anyone actually removing the card from the camera."

4

opportunity to observe the bed of Ralph Buckley's truck and discovered that the striations of the truck bed were dissimilar to those captured by the Bushnell Camera. Because of this observation, Mr. Dawson chose not to execute the search warrant and, instead, wrote Ralph Buckley a ticket for driving in the WMA and conspiracy to drive within the WMA based on the photographs retrieved from the Moultrie Camera. Mr. Dawson did not issue a citation to Jeremy Buckley out of concern that it might affect his job as a federal correctional officer.

On or about December 28, 2014, Ralph Buckley and his son, Jeremy Buckley, filed a Professional Standards Unit ("PSU") complaint against Mr. Dawson, Officer Srout, and another officer involved in the acquisition of the search warrant. The PSU complaint alleged that the officers failed to obey the laws governing DNR officers and that Mr. Dawson used false information to obtain the search warrant. Sgt. Antolini, a PSU investigator, was officially assigned to the investigation on January 8, 2015, by Maj. DeBord.

The DNR and the DNR employees contend that Sgt. Antolini conducted a thorough investigation from January 8, 2015 to February 7, 2015, including interviewing Mr. Dawson twice; presenting Mr. Dawson with a copy of the PSU complaint; interviewing the other officers named in the complaint, the complainants, and other witnesses; and visiting the location where the cameras were installed. Sgt. Antolini concluded that there was no evidence to support Mr. Dawson's search warrant affidavit. Col. Jenkins then asked

5

Sgt. Antolini to conduct a supplemental investigation, and Sgt. Antolini interviewed Mr. Dawson a third time. During that interview, evidence was again shown to Mr. Dawson, questions were asked by Sgt. Antolini, and Mr. Dawson agreed to undergo a polygraph examination. Sgt. James A. Hunt ("Sgt. Hunt") of the Charleston Police Department was engaged to conduct the polygraph examination of Mr. Dawson. The purpose of the exam was to ascertain if Mr. Dawson intended to be deceptive when he applied for the subject search warrant.

Sgt. Antolini's supplemental report indicated that "Sgt. Hunt advised that a polygraph examination to determine whether Officer Dawson had lied would not be advisable due to the fact that an investigation had already been completed and sustained the information on the search warrant as false." The supplemental report also stated that Sgt. Hunt had "further explained that a polygraph examination regarding Officer Dawson's intent at the time the search warrant was filed could be conducted even though that type of test was not routinely done."[7] Sgt. Antoloni informed Sgt. Hunt that he would like to move

---

[7] Sgt. Hunt stated in his report that he had informed Sgt. Antolini that "a polygraph could not be given on the issue of whether Steven Dawson had lied when he filed the search warrant due to an investigation proving he had." Sgt. Hunt also stated in his report that he informed Sgt. Antolini that a polygraph "could be conducted to determine if [Mr.] Dawson intended to lie[.]" However, "[a] polygraph regarding a person's intentions are not typically given, because a deception test of one's intent is not a valid test through the American Polygraph Association (APA.)." Furthermore Sgt. Hunt's report stated that "[t]his examination should not be used for any legal standing since a polygraph on one's intent is not a valid issue."

6

forward with the polygraph examination. Sgt. Hunt performed the polygraph "[d]ue to requests from both the accused, and a party of interest[.]" Sgt. Hunt concluded that Mr. Dawson's responses regarding his intent yielded "consistent and significant responses indicative of deceptive responses." Mr. Dawson resigned his employment immediately following the administration of the polygraph test.

After completing the supplemental investigation, the DNR and the DNR employees concluded that Mr. Dawson knowingly provided false or misleading information in an affidavit for a search warrant. On April 20, 2015, Maj. DeBord wrote to Jeremy Buckley concerning the results of the complaint and informed him that the complaint was sustained and that appropriate action had been taken. According to the Dawsons, once Jeremy Buckley received the letter, news of Mr. Dawson's falsification of evidence in a search warrant affidavit spread quickly throughout the law enforcement community and community at large.

On May 18, 2015, Mr. Dawson filed a grievance with the West Virginia Public Employee's Grievance Board pursuant to West Virginia Code § 6C-2-1 (LexisNexis 2015). Mr. Dawson sought exoneration of the charge that he had falsified a search warrant

_____

(. . . continued)

Nevertheless, later in the underlying litigation, Sgt. Hunt stated in an affidavit that, based on his training, experience, and education, Mr. Dawson's "polygraph produced valid, accurate, and reliable results."

7

affidavit and removal of the finding from his personnel file.  Specifically, Mr. Dawson argued that he was constructively discharged and sought a rescission of his resignation. The grievance was denied at Level One, and a Level Two mediation session was unsuccessful.  Mr. Dawson appealed to Level Three, and a hearing was held on September 29, 2016.  The final decision of the Grievance Board Administrative Law Judge was issued on December 14, 2016.  The Grievance Board determined that numerous provisions of General Order No. 5[8] had been violated; directed Mr. Dawson to be reinstated to his previous position with back pay and interest, seniority, and benefits;[9] and ordered the DNR to expunge all negative, unprofessional, or detrimental information contained in Mr. Dawson's personnel file arising from the PSU complaint.  No appeal of this decision was ever taken by the DNR.[10]

During the course of the grievance proceedings, on August 5, 2015, the Dawsons filed their initial complaint against the DNR and the DNR employees[11] alleging defamation, false light, infringement of liberty interest without due process, reckless

---

[8] General Order No. 5 is a written, internal investigation policy of the DNR.

[9] Mr. Dawson gave his two weeks' notice of his intent to resign from his employment on the day he returned to employment with the DNR.

[10] West Virginia Code § 6C-2-5 (LexisNexis 2015) provides for the ability to appeal the decision of the administrative law judge to the Circuit Court of Kanawha County.

[11] The complaint was also filed against Jeremy Buckley; however, Mr. Buckley is not a party to this appeal.

infliction of emotional distress, and loss of consortium, and seeking both compensatory and punitive damages. On June 2, 2016, the circuit court entered an order staying the circuit court action to allow the resolution of the grievance proceedings. Following the decision of the Grievance Board, the Dawsons moved to amend their complaint to add an additional count of misrepresentation against Sgt. Antolini, and the circuit court granted the motion to amend. Thereafter, the DNR and the DNR employees filed a motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted.[12] The circuit court granted, in part, the motion to dismiss the amended complaint by dismissing the Dawsons' claim for punitive damages against the DNR and the DNR employees, but denied the motion to dismiss as to all other claims.

Once discovery was closed, the DNR and the DNR employees filed a motion for summary judgment on the basis of, among others, qualified immunity; and, after a hearing on September 7, 2017, the circuit court asked the parties to submit supplemental briefing on the issue of qualified immunity. On December 8, 2017, the circuit court denied the motion for summary judgment. The circuit court observed that, despite the DNR and the DNR employees' assertion that Sgt. Antolini conducted a proper and thorough investigation, the DNR chose not to appeal the Grievance Board decision, which found that the investigation violated numerous provisions of General Order No. 5. The circuit court also noted that the Grievance Board decision found that Sgt. Antolini mischaracterized the

---

[12] This motion to dismiss was not based upon qualified immunity principles.

9

validity of the polygraph examination. Additionally, the circuit court found that a clear reading of Sgt. Antolini's report suggests that the DNR determined that Mr. Dawson committed the crime of false swearing, although the DNR never pursued any criminal charges against Mr. Dawson for the alleged offense.

The circuit court took notice of the findings of the Grievance Board decision, where the Board found that "[t]here can be little question under the circumstances of this case that [Mr. Dawson's] resignation was involuntary" and ruled that "[a] finding that a law enforcement officer made false statements in an affidavit is a potential career ending event. But for the failure of the [DNR] to reach the correct decision in the internal investigation, [Mr. Dawson] would not have tendered his resignation."

The circuit court further found that Mr. Dawson was entitled to due process under General Order No. 5; the DNR and the DNR employees violated numerous provisions of that order; and there was a genuine issue of material fact regarding the exact number of violations of General Order No. 5. Heavily relying upon the Grievance Board decision, the circuit court found the following potential violations of General Order No. 5: (1) the DNR does not have a standard of proof to utilize to determine if a complaint should be sustained; (2) the investigator failed to notify Mr. Dawson regarding the nature of the complaint; (3) Sgt. Antolini failed to collect critical evidence, including the Bushnell Camera; (4) Maj. DeBord did not make a recommendation concerning the investigation; (5) interviews of potential witnesses were not recorded as required; and (6) an invalid

polygraph examination was administered, in spite of the fact that the test could not be used for legal purposes. The circuit court also found that Col. Jenkins sustained the complaint on the invalid polygraph, as Col. Jenkins admitted that he believed Mr. Dawson before the polygraph was administered. As a result of these findings, the circuit court concluded that there are genuine issues of material fact as to whether Mr. Dawson was afforded due process and as to whether the DNR and the DNR employees' acts or omissions were in violation of Mr. Dawson's clearly established constitutional rights, of which a reasonable person would have known.

The circuit court also found that, due to the number of potential violations of General Order No. 5 and Mr. Dawson's testimony that the environment at the DNR was hostile to him as a former law enforcement officer with the West Virginia State Police, there was a genuine issue of material fact regarding whether the DNR and the DNR employees' actions were malicious or oppressive. The circuit court further found that there is a genuine issue of material fact as to whether the DNR employees were acting within the scope of their employment because of the potential numerous violations of General Order No. 5. Ultimately, the circuit court concluded that "the record in this matter is laden with genuine issues and questions of material fact underlying the immunity determination" and denied the DNR and the DNR employees' motion for summary judgment. The DNR and the DNR employees now appeal the decision of the circuit court arguing that they are entitled to qualified immunity from the Dawsons' claims.

## STANDARD OF REVIEW

Ordinarily, an order denying a motion for summary judgment is interlocutory and not appealable; however, this Court has explicitly recognized "'[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the "collateral order" doctrine.' Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009)." Syl. pt. 1, *City of Saint Albans v. Botkins*, 228 W. Va. 393, 719 S.E.2d 863 (2011). Furthermore, "'[t]his Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court.' Syllabus Point 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W. Va. 80, 576 S.E.2d 807 (2002)." Syl. pt. 2, *W. Virginia State Police v. Hughes*, 238 W. Va. 406, 796 S.E.2d 193 (2017). This review, however, is guided by the following principle regarding qualified immunity:

> [t]he ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

Syl. pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996). "In this connection, it is the jury, not the judge, who must decide the disputed 'foundational' or 'historical' facts that underlie the immunity determination, but it is solely the prerogative of the court to make the ultimate legal conclusion." *Id.* at 149, 479 S.E.2d at 659. "Accordingly, a circuit court may not summarily dispose of a claim on grounds of qualified

12

or statutory immunity where there is a genuine issue of material fact underlying the immunity determination." *Maston v. Wagner*, 236 W. Va. 488, 498, 781 S.E.2d 936, 946 (2015). Additionally, we "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Painter v. Peavy*, 192 W. Va. 189, 192, 451 S.E.2d 755, 758 (1994) (citations omitted). Furthermore, when considering evidence at the summary judgment stage, courts must apply the following guidelines:

> The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Consequently, we must draw any permissible inference from the underlying facts in the most favorable light to the party opposing the motion. In assessing the factual record, we must grant the nonmoving party the benefit of inferences, as credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Summary judgment should be denied even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom. Similarly, when a party can show that demeanor evidence legally could affect the result, summary judgment should be denied.

*Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 59, 459 S.E.2d 329, 336 (1995) (citations and quotations omitted). With these standards in mind, we proceed to the parties' arguments.

13

## DISCUSSION

While the DNR and the DNR employees raise four assignments of error, all involve the basic legal structure of qualified immunity. Accordingly, we will begin by reviewing this Court's established qualified immunity principles. We have held that,

> "[i]n the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1 *et seq.*, and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer." Syl. Pt. 6, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

Syl. pt. 7, *W. Virginia Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014). Furthermore, this Court has held that,

> [t]o the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

Syl. pt. 11, *A.B.*, 234 W. Va. 492, 766 S.E.2d 751.

In the case *sub judice*, it is undisputed that the DNR is a state agency and that Col. Jenkins, Maj. DeBord, and Sgt. Antolini were DNR employees during the relevant

time period. It is further undisputed that the acts or omissions of the DNR and the DNR employees at issue in this matter were discretionary.[13] Therefore, the Dawsons may overcome the DNR and the DNR employees qualified immunity protections by demonstrating that these acts or omissions were in violation of a clearly established right of which a reasonable person would have known *or* were otherwise fraudulent, malicious, or oppressive. Additionally, even if these acts or omissions were in violation of a clearly established right of which a reasonable person would have known or were otherwise fraudulent, malicious, or oppressive, to determine whether the DNR, itself, retains its immunity protections, it must be established whether the individual DNR employees were acting outside the scope of their employment.

### A. *Clearly Established Right of which a Reasonable Person Would Have Known*

There being no question that the acts or omissions of the DNR and the DNR employees were discretionary, we first turn to the question of whether these alleged acts or omissions could be in violation of a clearly established right of which a reasonable person would have known. *See* Syl. pt. 11, *A.B.*, 234 W. Va. 492, 766 S.E.2d 751. The sole clearly established right asserted by the Dawsons and addressed by the circuit court below is the

---

[13] *See Taylor v. W. Virginia Dep't of Health & Human Res.*, 237 W. Va. 549, 558-59, 788 S.E.2d 295, 304-05 (2016) ("For purposes of qualified immunity, this Court has noted that 'the broad categories of training, supervision, and employee retention . . . easily fall within the category of "discretionary" governmental functions.' *W. [Virginia] Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 514, 766 S.E.2d 751, 773 (2014).").

infringement of a liberty interest without appropriate procedural due process protections. The DNR and the DNR employees contend that no liberty interest was implicated, and, even if it was, they did not violate the interest during the investigation of the PSU complaint and/or the alleged violated right was not clearly established. On the other hand, the Dawsons argue that there was an implicated liberty interest, that inadequate due process procedural protections were in place, and that this right was clearly established at the time of the DNR and the DNR employees' actions.

The Dawsons assert that Mr. Dawson's status as a state civil service employee entitled him to a constitutionally protected liberty interest in his good name. We apply a two-step inquiry to determine whether an employer infringed on its employee's liberty or property interest. First, we must determine if "the employee [has] a liberty or property interest at stake[.]" *W. Virginia Bd. of Educ. v. Marple*, 236 W. Va. 654, 664, 783 S.E.2d 75, 85 (2015). If so, we must determine "how much process is he/she entitled [to receive] under our Due Process Clause." *Id.* Accordingly, we have to first determine whether Mr. Dawson had a liberty interest at stake. We have previously recognized a liberty interest in one's good name. *See* Syl. pt. 2, *Waite v. Civil Serv. Comm'n*, 161 W. Va. 154, 241 S.E.2d 164 (1977), *overruled on other grounds by W. Virginia Dep't of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017) ("The 'liberty interest' includes an individual's right to freely move about, live and work at his chosen vocation, without the burden of an unjustified label of infamy. A liberty interest is implicated when the State makes a charge against an individual that might seriously damage his standing and

16

associations in his community or places a stigma or other disability on him that forecloses future employment opportunities.").  This Court has recently further held that

> [a] government employer implicates its employee's liberty interest in his/her good name when the following elements are alleged: (1) a stigmatizing statement; (2) which was false; (3) was published, or made accessible to the public; (4) in connection with a serious adverse employment action. When these elements are met, the employee must be afforded procedural safeguards under Article III, Section 10 of the West Virginia Constitution.

Syl. pt. 6, *W. Virginia Dept. of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017).

Therefore, if all four of these elements are satisfied, then an employee's liberty interest in his/her good name is implicated, and procedural safeguards must be provided.[14]

The DNR and the DNR employees argue that at least three of the four elements are not satisfied:  stigmatizing statement, publication, and adverse employment action.  Because we agree that there was no publication, we do not need to examine the other three elements.  The Dawsons allege that a publication occurred for two separate reasons:  (1) Mr. Dawson would have to abide by mandatory disclosures regarding the

---

[14] To the extent our cases can be construed to give civil service employees a liberty interest in continued government employment, *see W. Virginia Dept. of Educ. v. McGraw*, 239 W. Va. 192, 199 n.23, 800 S.E.2d 237 n.23 (2017), those procedural protections have also been afforded to Mr. Dawson in this case.  Specifically, Mr. Dawson received numerous opportunities to present evidence and explain himself during the three interviews given prior to his resignation and during the Grievance Board hearing post-termination.  Moreover, it does not appear that he requested any further hearing prior to his resignation that he was not provided, and the Grievance Board ultimately expunged this sustainment from his employment records, cleared his name, and reinstated him to his previous position.

17

sustainment of allegations that he falsified a search warrant affidavit if he participated in any court proceedings in the context of his employment and (2) a disposition letter regarding the complaints was sent to Jeremy Buckley following the sustainment. We are not persuaded that either of these particular situations under this set of facts rises to the level of what constitutes a publication of a stigmatizing statement[15] as a matter of law in the context of implicating a liberty interest in one's good name.

As an initial matter, in determining whether a stigmatizing statement was made public, it is important to examine the history of this Court's case law on publication in the context of violation of a liberty interest. In Syllabus point 2 of *Waite*, 161 W. Va. 154, 241 S.E.2d 164, we held that

> [t]he "liberty interest" includes an individual's right to freely move about, live and work at his chosen vocation, without the burden of an unjustified label of infamy. A liberty interest is implicated when the State makes a charge against an individual that might seriously damage his standing and associations in his community or places a stigma or other disability on him that forecloses future employment opportunities.

In *Freeman v. Poling*, 175 W. Va. 814, 822, 338 S.E.2d 415, 423 (1985), we stated that "[w]ithout a public disclosure of accusations against [the employee], he cannot claim that

---

[15] On appeal, the Dawsons assert that the stigmatizing statement was the underlying charge and labeling of Mr. Dawson "as dishonest by finding that he intentionally inserted false information in an affidavit for [a] search warrant." However, we do not need to reach a decision on whether this was a stigmatizing statement because we find there to be no publication in this case.

18

his 'standing and associations in his community' have been damaged." (citations omitted).

Finally, in *McGraw*, 239 W. Va. at 195, 800 S.E.2d at 230, we explained that publication

was one of four elements necessary to actually implicate a government employee's liberty

interest. Moreover, in *McGraw*, this Court explained that its rationale for the publication

element

> is that if the statement is not made public, "it cannot properly
> form the basis for a claim that the [employee's] interest in his
> 'good name, reputation, honor, or integrity,' was . . . impaired."
> A statement about a government employee which is kept
> private is not sufficiently likely to affect the employee's good
> name outside his/her work-world and thus form a proper basis
> for a liberty interest violation.

*McGraw*, 239 W. Va. at 201, 800 S.E.2d at 239 (alteration in original) (footnote omitted).

Accordingly, as demonstrated by the above, the heart of the infringement of a liberty

interest in one's good name is whether there was dissemination of a stigmatizing statement

that adversely affects an individual's prospective employment.

We now need to examine the Dawsons' two assertions of publication using

the above as a guidepost. The Dawsons first assert that "a finding that a law enforcement

officer falsified an affidavit unmistakably falls within the mandatory disclosure

requirements of *Brady v. Maryland*, 373 U.S. [83, 83 S. Ct. 1194, 10 L. Ed. 2d 215] (1963),

*Giglio v. United States*, 405 U.S. 150[, 92 S. Ct. 763, 31 L. Ed. 2d 104] (1972), and their

progeny whenever Dawson testified in later criminal cases." The Dawsons further contend

that Mr. Dawson was "actually required to make such disclosures to criminal defendants[,]

19

and as such, his sustainment was publicized."[16]   This assertion rests solely on Mr. Dawson's own compelled self-publication of his sustainment of the charges.

The Dawsons cite to no legal authority for their proposition that Mr. Dawson's own statements constitute publication.  While our Court has not addressed the issue of compelled self-publication, federal courts in West Virginia have.  In *Rice v. Community Health Association*, 40 F. Supp. 2d 783, 786 (S.D.W. Va. 1998), the plaintiff raised a claim of compelled self-publication.  *Id.*  The *Rice* court noted that "West Virginia courts have not addressed or recognized this issue of compelled self-publication" but that the Fourth Circuit Court of Appeals had examined this issue.  *Id.*  After analyzing the Fourth Circuit's opinion, the *Rice* court rejected the "theory of defamation through compelled self-publication."  *Id.  Accord Rice v. Rose & Atkinson*, 176 F. Supp. 2d 585, 594 (S.D.W. Va. 2001), *aff'd*, 36 F. App'x 97 (4th Cir. 2002) ("This Court previously rejected Plaintiff's theory of defamation through compelled self-publication as a matter of law." (citation omitted)).  *See also Prater v. Henry Schein, Inc.*, 621 F. Supp. 2d 363, 371 (S.D.W. Va. 2008) ("If a West Virginia court were to address compelled self-publication, this Court is far from convinced that it would adopt the doctrine.").

---

[16] We note that the deposition testimony that Mr. Dawson cites to only indicates that Mr. Dawson told two attorneys that were working on criminal cases that he had this sustainment.  There is no indication that he actually testified in court regarding his sustainment.  Moreover, since that time the Grievance Board reinstated Mr. Dawson and expunged his entire record relating to these events.

20

Furthermore, other jurisdictions have thoroughly considered this notion. The majority of the cases that have discussed the doctrine of compelled self-publication do so in the common law defamation context. *See, e.g.*, *Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 886-88 (Minn. 1986).[17] That is not the case before us now, and even if it were, the vast majority of courts have declined to utilize or adopt this doctrine. *See, e.g.*, *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994) ("Since [compelled self-defamation] is a minority view, and a very questionable one—it makes it impossible for an employer to communicate his grounds for discharging an employee to the employee even confidentially without incurring a grave risk of being sued for defamation[.]").[18]

Additionally, even in the minority of jurisdictions that have adopted the doctrine of compelled self-publication, courts have distinguished utilizing it in the liberty interest context. For example, in *Phillips v. State*, 725 N.W.2d 778, 785 (Minn. Ct. App. 2007), the court noted that "Minnesota has recognized the doctrine of compelled self-publication, but only as it relates to defamation actions." (citation omitted). However, the *Phillips* court held that, "in Minnesota, the doctrine of compelled self-publication as it relates to separation from employment is limited to defamation actions and does not

---

[17] However, after *Lewis* was decided, the Minnesota legislature limited the *Lewis* court's holding. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 580 n.1 (Tex. 2017) citing Minn. Stat. Ann. § 181.933(2).

[18] Additionally, "[n]umerous federal courts applying state law have also rejected a cause of action for compelled self-defamation." *Emery v. Ne. Illinois Reg'l Commuter R.R. Corp.*, 880 N.E.2d 1002, 1011 (Ill. App. 2007) (citing cases).

21

support a claim alleging violation of a liberty interest." *Id.* (citation omitted). The *Phillips* court was persuaded by the federal courts reasoning "that [the] doctrine of compelled self-publication 'is inconsistent with the fundamental principle of mitigation of damages' because likelihood of self-publication is speculative and applying [the] doctrine in [a] due process context would encourage plaintiffs to unnecessarily publish to increase damages[.]" *Id.* (quoting *Olivieri v. Rodriguez*, 122 F.3d 406, 408-09 (7th Cir. 1997)).[19] Accordingly, as a matter of law, we are not persuaded that Mr. Dawson's alleged compelled self-publication constitutes a publication that would infringe upon his liberty interest in his own good name.

Second, the Dawsons assert that the DNR and its employees "sent Jeremy Buckley, a member of the public, a disposition letter advising that his complaints against [Mr.] Dawson had been sustained."[20] The Dawsons further assert that the DNR and its

---

[19] The Seventh Circuit also noted that the doctrine of compelled self-publication is "largely discredited" and that "[m]ost states . . . reject self-defamation as a basis for a tort claim, and it would be odd for federal constitutional law to embrace this questionable doctrine." *Olivieri v. Rodriguez*, 122 F.3d 406, 408-09 (7th Cir. 1997).

[20] The entirety of the letter read as follows:

Dear Mr. Buckley:

I have received the results of the Internal Affairs Unit Investigation in the matter of the conduct of NRPO Steven Dawson. This investigation was initiated as a result of the complaint filed by you, which was received on January 5, 2015.

employees "did not request for the disposition to remain confidential."  Once again, the Dawsons cite to absolutely no legal authority for the proposition that this particular conduct constitutes a publication regarding a violation of one's liberty interest in his good name.

While this Court has not yet defined particular conduct that demonstrates exactly what constitutes a publication in the context of an infringement of a liberty interest in one's good name, a review of other jurisdictions and how they have examined the issue of publication is instructive.  Other courts have noted that "[t]he distinction between mere defamation and an infringement of liberty of occupation is merely one of degree, especially when the defamation relates to a person's fitness for a particular type of employment, but it is a distinction to which the courts are committed."  *Olivieri*, 122 F.3d at 408.  *See also Aitken v. Reed*, 949 P.2d 441, 447-48 (Wash. App. 1998) ("The constitutional liberty interest in one's good name is different from a general defamation claim—the publication

---

(. . . continued)

A thorough review of the facts surrounding the incident has supported your allegation.  The complaint has been closed as sustained, and the appropriate action has been taken.

If you have any questions, you may contact me at (XXX) XXX-XXX.

BY DIRECTION OF THE CHIEF

COLONEL JERRY B. JENKINS

Major B.C. DeBord, Coordinator

LES Internal Investigations and Inquiries

23

must prevent one from obtaining future employment, not merely damage one's reputation. *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 (7th Cir.1986); *Waddell v. Forney*, 108 F.3d 889, 896 (8th Cir.1997)."). In other words, while the issues of defamation and infringement of employment liberty interests are similar in nature, each has its own distinctions that must be kept in mind and that what might constitute a publication is different for defamation than for a violation of a liberty interest. Essentially, publication in the liberty interest context is a higher burden than in the defamation context. *See Potter v. Bd. of Regents of the Univ. of Nebraska*, 844 N.W.2d 741, 751 (Neb. 2014) (footnote omitted) ("[M]ore is required to allege the necessary level of defamation and dissemination in a stigma-plus due process claim than the kind of damage to reputation sufficient for a simple tort defamation claim."). *See also Ratliff*, 795 F.2d at 627 ("In a common law defamation action, any publication of false and defamatory material might be sufficient, but in the context of the liberty interest protected by the Fourteenth Amendment, [the plaintiff] was required to show broader publication.").

Notably, other courts have found it difficult to pinpoint what exactly constitutes a publication in the context of a violation of a liberty interest:

> The purpose of the requirement is to limit a constitutional claim to those instances where the stigmatizing charges made in the course of discharge have been or are likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities. In determining the degree of dissemination that satisfies the "public disclosure" requirement, we must look to the potential effect of dissemination on the employee's standing in the community and the foreclosure of job

> opportunities. As a result, what is sufficient to constitute "public disclosure" will vary with the circumstances of each case.

*Brandt v. Bd. of Co-op. Educ. Servs., Third Supervisory Dist., Suffolk Cty., N.Y.*, 820 F.2d 41, 44 (2d Cir. 1987).

Here, the record before us demonstrates no evidence that the act of giving this vague, one-page letter to the person who made the initial complaint foreclosed any employment opportunities that may have otherwise been available to Mr. Dawson.[21] The substance of the letter in and of itself is only four sentences that essentially state that some undescribed allegation has been sustained and that some undescribed appropriate action has been taken. The disposition letter does not contain any direct statement that the allegation sustained concerned falsifying a search warrant affidavit, and there were no other documents attached, let alone documents that would show what allegation had been sustained.[22] Moreover, there are no allegations or evidence in the record that documents were placed in Mr. Dawson's personnel file that were detrimental to him.[23] There also are

---

[21] In fact, during his deposition, Mr. Dawson admitted that it is important for an agency that has completed an investigation "to let the person who complained know the resolution of the complaint[.]" Furthermore, General Order No. 5 § 2.4 provides that "[t]he chief, or his/her designee, shall notify all concerned parties, as determined by the chief, upon completion of the internal investigation."

[22] Additionally, Jeremey Buckley's complaint alleged several allegations, not just that Mr. Dawson falsified a search warrant affidavit. This letter is not clear as to which allegation has even been sustained.

[23] *See Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 650 (4th Cir. 2007) ("A plaintiff need not allege that his file has actually been disseminated to particular

no allegations or evidence in the record that demonstrate that the underlying investigative documents, reports, or polygraph results were ever disseminated to anyone;[24] that the DNR or the DNR employees gave this letter to any prospective employers or that any prospective employers even knew about the letter's existence;[25] that any prospective employers spoke to the DNR or the DNR employees regarding any employment opportunities or the

---

prospective employers. But, he must allege more than that his file 'may be available' to them. We thus hold that an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file."). *See also Brandt v. Bd. of Co-op. Educ. Servs., Third Supervisory Dist., Suffolk Cty., N.Y.*, 820 F.2d 41, 45 (2d Cir. 1987) ("Courts of appeals for other circuits have similarly concluded that the public disclosure requirement has been satisfied where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed to prospective employers." (citations omitted)).

[24] *See Buhr v. Buffalo Pub. Sch. Dist. No. 38*, 509 F.2d 1196, 1199 (8th Cir. 1974) ("[W]here reasons for nonrenewal are announced publicly or are incorporated into a record made available to prospective employers, such reasons may indeed affect the dischargee's chances of securing another job.").

[25] Mr. Dawson testified that he has not applied for any other employment since he resigned from the DNR after the polygraph examination on April 1, 2015. He further testified that he has been offered several employment positions since the sustainment, including chief deputy in Hardy County, assistant chief of police in Moorefield, a plainclothes investigator, and a private investigator. Mr. Dawson testified that he voluntarily told these individuals offering employment about the PSU sustainment and that there were some that still offered him the employment. However, he told each employer that he could not accept the offers because of the *Giglio* disclosures. He further stated that he does not apply for any employment because he would have to disclose his sustainment. Moreover, Mr. Dawson testified that he has not tried to contact anyone for a position since the Grievance Board ruling clearing his name of all allegations and expunging all negative statements and documents retained by the DNR regarding this PSU sustainment.

26

sustainment;[26] or that the letter was sent to a news media outlet or public forum.[27]  Thus, we find under the particular facts and narrow circumstances of this case that the dissemination of the disposition letter to Jeremey Buckley, the initial complainant, does not constitute publication.  Because one essential element, publication, is not satisfied, Mr. Dawson cannot show that his liberty interest was implicated.[28]  In turn, he was not entitled to procedural safeguards under the Due Process Clause in this regard.[29]  Accordingly, we reverse the circuit court's denial of summary judgment as to whether there was a violation of a clearly established right, and find the DNR and the DNR employees are entitled to

---

[26]  *See Fontana v. Comm'r of Metro. Dist. Comm'n*, 606 N.E.2d 1343, 1346 (Mass. App. Ct. 1993) ("A liberty interest arises where, as here, a public employee is discharged because of stigmatizing charges alleged by the employee to be false and which are disseminated to the public or are likely to be communicated to prospective employers." (citations omitted)).

[27] *See Ventetuolo v. Burke*, 596 F.2d 476, 484 (1st Cir. 1979) ("Moreover, as the district court noted, these cases that found a liberty interest infringement due to disclosure usually involved public meetings or the news media. *See, e. g.*, *Owen v. City of Independence*, 560 F.2d 925, 936-37 (8th Cir. 1977), *vacated and remanded on other grounds*, 438 U.S. 902, 98 S. Ct. 3118, 57 L.Ed.2d 1145 (1978); *Staton v. Mayes*, 552 F.2d 908, 911 n.6 (10th Cir.), *cert. denied*, 434 U.S. 907, 98 S. Ct. 309, 54 L.Ed.2d 195 (1977) (public meeting with representatives of press present); *Huntley v. Community School Board of Brooklyn*, 543 F.2d 979, 983 (2d Cir. 1976), *Cert. denied*, 430 U.S. 929, 97 S. Ct. 1547, 51 L.Ed.2d 773 (1977) (public meeting); *David Gonzalez v. Calero*, 440 F.Supp. 989, 996 (D.C.P.R.1977) (newspaper publicity); *Galaway v. Lawson*, supra, 438 F.Supp. at 974 (newspaper publicity).").

[28] Because all four elements must be satisfied, when one element is not met we need not further discuss whether the other three elements were met. *See* Syl. pt. 6, *McGraw*, 239 W. Va. 192, 800 S.E.2d 230.

[29] We also note that this finding is limited to the context of infringement of a liberty interest, and this Court makes no decision on whether a publication occurred for any other cause of action.

27

partial summary judgment and have established their entitlement to qualified immunity as to this first method.

### B. Fraudulent, Malicious, or Oppressive Conduct

Because the two methods for establishing that a discretionary governmental act is subject to qualified immunity are stated in the alternative, our determination that the first element is satisfied necessitates that we examine whether the Dawsons' claims might overcome immunity as to the second element.[30] Accordingly, we must examine whether there are genuine issues of material fact concerning whether these acts or omissions of the DNR and the DNR employees were otherwise fraudulent, malicious, or oppressive. In the instant matter, the DNR and the DNR employees assert that the circuit court incorrectly found that there is a genuine issue regarding a material fact as to whether the conduct of

---

[30] The DNR and the DNR employees further state that "[t]he only constitutional right identified by the [circuit court] was the liberty interest associated with [the Dawsons'] infringement of a liberty interest without due process of law claim." They attempt to argue that the claims of defamation, false light, reckless infliction of emotional distress, and misrepresentation must be dismissed because they, themselves, do not implicate any violation of a constitutional or statutory right. However, this argument is misplaced because each of these claims are also based upon the contention that the DNR and the DNR employees substantiated a false complaint by conducting a fundamentally flawed investigation borne out of hostility and reprisal. As such, this could also satisfy the alternative requirement test of fraudulent, malicious, or oppressive conduct and does not necessitate a dismissal. *See Taylor v. W. Virginia Dep't of Health & Human Res.*, 237 W. Va. 549, 559, 788 S.E.2d 295, 305 (2016) ("Moreover, petitioners' false light invasion of privacy claims are based upon their contention that respondents' investigation and the ensuing search warrant were unsubstantiated accusations of criminal activity borne out of reprisal—plainly satisfying the requirement of 'fraudulent, malicious, or oppressive' activity.").

28

the DNR and the DNR employees was malicious and/or oppressive. On the contrary, the Dawsons allege that "[i]n consideration of the record evidence and permissible inferences to be drawn therefrom, the circuit court correctly concluded that genuine issues of material fact exist regarding whether the Petitioners' actions were malicious or oppressive." We agree with the Dawsons.

Throughout the history of our qualified immunity case law, this Court has continually and consistently held that one way to defeat qualified immunity is by alleging that the acts or omissions of a public official or employee were fraudulent, malicious, or oppressive. *See, e.g.*, Syl., in part, *State v. Chase Sec., Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992) ("There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive. To the extent that *State ex rel. Boone National Bank of Madison v. Manns*, 126 W. Va. 643, 29 S.E.2d 621 (1944), is contrary, it is overruled."). *Accord* Syl. pt. 8, *Parkulo v. W. Virginia Bd. of Prob. & Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996) (same); *Hutchison*, 198 W. Va. at 149, 479 S.E.2d at 659 (same); Syl. pt. 3, *Clark*, 195 W. Va. 272, 465 S.E.2d 374 (same). *See also* Syl. pt. 12, in part, *A.B.*, 234 W. Va. 492, 766 S.E.2d 751 ("If the plaintiff . . . *can otherwise identify fraudulent, malicious, or oppressive acts committed by [the State, its agencies, officials, or employees]*, the court must then determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment." (emphasis added)). Moreover, in *Hutchison*, this Court essentially equated "malicious" conduct to conduct that

29

is "wilful [sic] or intentional wrongdoing." 198 W. Va. at 149, 479 S.E.2d at 659.[31] Accordingly, it is clear that our case law has continuously recognized that a state actor's malicious conduct will overcome qualified immunity protections.

We now turn to the facts of the case *sub judice*. Because we address this issue in the context of summary judgment, we express no view on the merits of the Dawsons' underlying claims. This Court's sole purpose is to determine whether there are genuine issues of material fact that would preclude summary judgment. Furthermore, we have previously found that, "[p]articularly in complex cases . . . where issues involving motive and intent are present, summary judgment should not be utilized as a method of resolution." *Kelley*, 221 W. Va. at 510, 655 S.E.2d at 532 (citations and quotations omitted). Additionally, this Court has noted that the determination of whether a state actor's conduct was malicious is a "question[] for the fact-finder." *Maston*, 236 W. Va. at 508 n.15, 781 S.E.2d at 956 n.15. *See also Taylor v. W. Virginia Dep't of Health & Human*

---

[31] Furthermore, other jurisdictions have construed the term "malice" similarly. For example, in *Shoemaker v. Smith*, 353 Md. 143, 146, 725 A.2d 549, 551 (1999), the Maryland Court of Appeals defined what constituted "malice" under the qualified immunity doctrine holding that an "actual malice" standard would apply—in other words, was the conduct of the state actor "motivated by ill will, by an improper motive, or by an affirmative intent to [cause injury]." *Id.* at 164, 725 A.2d at 560. This "motive or animus may exist even when the conduct is objectively reasonable." *Id.* Additionally, Georgia courts also employ a similar standard. *See, e.g.*, *Russell v. Barrett*, 296 Ga. App. 114, 118, 673 S.E.2d 623, 627 (2009) ("However, the 1991 amendment specifies the actions that remove the protection of immunity—those done with actual malice or with actual intent to cause injury. Our Supreme Court has construed the term '"actual malice" [as requiring] a deliberate intention to do wrong.'" (emphasis added) (citation omitted)).

*Res.*, 237 W. Va. 549, 559, 788 S.E.2d 295, 305 (2016) ("[T]his case contains a pervasive factual dispute about each of the parties' motivations, precluding entry of summary judgment on qualified immunity grounds.").

In the present matter, the circuit court posed the following question:

> Based upon the numerous, undisputed and clear violations of General Order No. 5 throughout the internal investigation process in light of the magnitude and serious nature of the charge against [Mr.] Dawson, were the acts or omissions of the [DNR and the DNR employees] merely an oversight or negligence? Or, do conflicting or permissible inferences from the record exist to permit a trier of fact to determine such conduct by the [DNR and the DNR employees] as malicious or oppressive?

The circuit court then found that it would be required to weigh the evidence and make credibility determinations to decide whether the conduct was malicious or oppressive and that it would be improper for the circuit court to do so at the summary judgment stage. We agree.

Here, the DNR and the DNR employees "argue that no evidence of malice or oppressive conduct exists in the record evidence." However, as the circuit court correctly noted, there is evidence in the record that could lead a jury to infer a malicious or oppressive motive. This evidence includes, but is not limited to: (1) the failure to review the actual search warrant that was at issue in the underlying investigation; (2) the potential numerous violations of General Order No. 5 over the course of the underlying

31

investigation;[32] (3) the failure to secure the Bushnell camera at issue and its subsequent destruction; (4) the failure to interview the owner of the SUV that was also photographed in the WMA; (5) Sgt. Antolini's characterization of several critical facts about the polygraph examination; (6) Maj. DeBord's failure to make a separate recommendation concerning the investigation as he was required to do pursuant to General Order No. 5; (7) the sustainment of the complaint against only Mr. Dawson and not the other officers; and (8) the general allegations of hostility towards Mr. Dawson when he enlisted with the DNR following his retirement from the West Virginia State Police. Although these facts themselves may be undisputed, differing conclusions and inferences may be drawn therefrom. *See Williams*, 194 W. Va. at 59, 459 S.E.2d at 336 (citation omitted) (finding that summary judgment should "be denied 'even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom'").

---

[32] The DNR and the DNR employees, relying on *Crouch v. Gillispie*, 240 W. Va. 229, 809 S.E.2d 699 (2018), argue that evidence of internal policy violations are not material to a qualified immunity analysis and, therefore, cannot be relied upon to examine whether a state actor has acted maliciously. This argument is misplaced. The *Crouch* Court did not examine whether a state actor's conduct was malicious in any capacity. Rather the focus of *Crouch* was whether internal policy violations rose to the level of being violations of a clearly established right. Ultimately, the *Crouch* Court held:

> [w]e are wary of allowing a party to overcome qualified immunity by cherry-picking a violation of any internal guideline irrespective of whether the alleged violation bears any causal relation to the ultimate injury. Therefore, in the absence of allegations tying the alleged violations to [the] death, we are unable to view this case as more than an abstract assertion that DHHR could have investigated more thoroughly.

*Crouch*, 240 W. Va. at 237, 809 S.E.2d at 707 (footnote omitted).

Therefore, the circuit court correctly found that there are genuine issues of material fact regarding whether the actions of the DNR and the DNR employees were malicious and oppressive, and that these are questions for the fact-finder.[33]

## C. Scope of Employment

Because we have found that the Dawsons' claims might overcome the DNR and the DNR employees' assertion of qualified immunity as to the second method, i.e. that the acts and omissions of the DNR and the DNR employees were fraudulent, malicious, or oppressive, we must next examine whether a reasonable juror could find that the DNR employees' acts or omissions were outside of their official capacity as DNR officers. As we have previously held,

> [i]f the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment.

---

[33] The extent to which these facts may be subjective is of no moment, and we are unpersuaded by the DNR and the DNR employees' argument that courts must always and only apply an objective analysis in the context of qualified immunity. The DNR and the DNR employees rely on *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009), for its assertion. This reliance is misplaced. A complete reading of *Robinson* provides that "[t]he subjective motivations of a police officer are not relevant to a determination of whether qualified immunity exists in connection with allegations of an unreasonable search and seizure, an unlawful detention, or the use of excessive force." Syl. pt. 4, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660. The *Robinson* Court made it very clear that it was deciding only whether a subjective analysis was appropriate in the context of evaluating an officer's conduct regarding three causes of action: (1) unreasonable search and seizure, (2) unlawful detention, and (3) excessive force. *Id.* This is not the case before us now.

33

Syl. pt. 12, in part, *A.B.*, 234 W. Va. 492, 766 S.E.2d 751. This Court has further held that, "[t]o the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability, but the public employee or official is not entitled to immunity[.]" *Id.* However, "[i]f the public official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior* along with the public official or employee." *Id.*

In the present matter, the DNR employees essentially assert that the actions of Col. Jenkins, Maj. DeBord, and Sgt. Antolini were all specifically or impliedly directed by the employer, and, therefore, within their respective scopes of employment. However, the Dawsons argue that the circuit court correctly determined that there are genuine issues of material fact as to whether the DNR employees were acting within their respective scopes of employment and that this issue must be decided by the fact-finder.

Whether an employee was acting within the scope of his employment "may or may not turn on disputed issues of material fact." *A.B.*, 234 W. Va. at 508, 766 S.E.2d at 767. Furthermore, in *A.B.* this Court applied general principles of agency in the qualified immunity context. *Id.* at 508, 766 S.E.2d at 767. Specifically, as this Court held

> in Syllabus Point four of *Griffith v. George Transfer and Rigging, Inc.*, 157 W. Va. 316, 201 S.E.2d 281 (1973), whether

34

an agent is "acting within the scope of his employment and about his employer's business . . . , is *generally* a question of fact for the jury and a jury determination on that point will not be set aside *unless clearly wrong*." (emphasis added). *See also* Syl. Pt. 1, in part, *Laslo v. Griffith*, 143 W. Va. 469, 102 S.E.2d 894 (1958) ("When the facts relied upon to establish the existence of an agency are undisputed, and conflicting inferences can not be drawn from such facts, the question of the existence of the agency is one of law for the court[.]"); *Cremeans v. Maynard*, 162 W. Va. 74, 86, 246 S.E.2d 253, 259 (1978) (stating where evidence "conclusively shows lack of authority and where conflicting inferences cannot be drawn" the court may decide issues of agency).

*A.B.*, 234 W. Va. at 509, 766 S.E.2d at 768. We have further noted that "'[s]cope of employment' is a relative term and requires a consideration of surrounding circumstances including the character of the employment, the nature of the wrongful deed, the time and place of its commission and the purpose of the act." *Griffith*, 157 W. Va. at 326, 201 S.E.2d at 288.

Here, the particular function being carried out by the DNR employees, i.e. investigation of Mr. Dawson's conduct, was certainly within the scope of their employment. However, we find the manner in which they carried out this function, including violating multiple internal rules; Col. Jenkins' approval of the violations of General Order No. 5; discussions with Mr. Dawson on personal time; failure to exonerate Mr. Dawson; Maj. DeBord's failure to make his own recommendations; dissemination of the disposition letter which conceivably inaccurately implied that all complaint allegations were sustained against Mr. Dawson; insistence on an improper polygraph examination; failure to secure certain evidence, review certain evidence, and interview certain witnesses;

35

sustainment of the complaint against only Mr. Dawson and not the other officers; and Sgt. Antolini's alleged hostility towards Mr. Dawson after Mr. Dawson became employed by the DNR following his employment with the West Virginia State Police raise conflicting inferences and questions of fact as to whether such conduct was within the scope of employment such that a jury should determine this issue. Accordingly, the circuit court correctly found that there are genuine issues of material fact regarding whether the actions of the DNR employees were acting within their respective scopes of employment.

### D. Timing of Motion for Summary Judgment

Lastly, the DNR and the DNR employees contend that the circuit court erred to the extent it based its denial of their motion for summary judgment, which was filed after the close of discovery, upon its finding that the motion was untimely and inconsistent with *Matson v. Wagner*, 236 W. Va. 488, 781 S.E.2d 936 (2015), which encourages a ruling on qualified immunity early in the proceedings. While the circuit court did include a very general finding in its order that the DNR and the DNR employees did not file this motion until two years after the filing of the complaint (which is a correct statement), it clearly did not rely solely on the timing of the motion in making its ruling. The circuit court's forty-four page order includes a detailed analysis regarding the other three issues discussed above and found that the genuine issues of material fact preclude summary judgment. Specifically, the circuit court ruled:

> In light of the foregoing, and being cognizant that this Court's function at the summary judgment [stage] is not to weigh the evidence and/or determine the truth of the matter but

36

> to determine whether there are genuine issues for trial, the Court FINDS and CONCLUDES that the record in this matter is laden with genuine issues and questions of material fact underlying the immunity determination – those that have the capacity to sway the outcome of the litigation under applicable law – which prohibit this Court from summarily disposing of the [DNR and the DNR employees'] claims.

Accordingly, we decline to reverse the circuit court's order based upon this issue.

## IV.

## CONCLUSION

For the reasons previously stated, we affirm, in part; and reverse, in part the circuit court's order denying summary judgment on the ground of qualified immunity. We further direct the circuit court to enter an order granting partial summary judgment to the DNR and the DNR employees as directed by the foregoing discussion, and remand this matter to the circuit court for further proceedings consistent with this opinion.

Affirmed, in part;
Reversed, in part; and Remanded.

37